[No. 16616. *En Banc.* June 16, 1922.]

JENNIE CONNER, *as Administratrix etc., Respondent,* v. C. W. HODGDON *et al., Appellants,* CHARLES W. HODGDON, *as Executor etc., Appellant.*[1]

ATTORNEY AND CLIENT (34)—DUTIES AND LIABILITIES TO CLIENT—
ACQUIRING ADVERSE INTEREST—PURCHASE AT EXECUTION SALE. Confidential relations once established between attorney and client do not end with the recovery of judgment in pending litigation; and in the absence of some positive act or complete abandonment, the attorney may not bid in for his own use the property of his client on execution sale, where the plaintiff became insane or did not consent.

WITNESSES (49)—COMPETENCY—TRANSACTIONS WITH DECEASED—
WAIVER OF STATUTE. Defendant, called as a witness for plaintiff, is precluded by Rem. Comp. Stat., § 1211, from testifying as to a conversation with plaintiff's decedent; and the statute is not waived by the fact that he was examined by the plaintiff as to what he did, where he was not examined as to any transaction or conversation with the decedent.

TRUSTS. (53)—ENFORCEMENT OF TRUST—DECREE—SCOPE AND EXTENT OF RELIEF—RIGHTS OF INTERVENING THIRD PERSONS. Where defendant was declared to hold land in trust for the plaintiff and render an account to him, it is not error to refuse any relief to an intervener, holding a mortgage on the land, until after the accounting.

[1]Reported in 207 Pac. 675.

SAME (49)—ENFORCEMENT OF TRUST — ACTIONS — LIMITATIONS—
LACHES. An action by an administrator to declare a trust in lands
in favor of the estate of the decedent, who died in an insane asylum,
will not be dismissed on account of laches, where it was commenced
within a year and a day of the death of the decedent and there was
no unreasonable delay after the plaintiff knew or should have known
of the trust.

FULLERTON and MITCHELL, JJ., dissent.

Appeals from a judgment of the superior court for Grays Harbor county, Chapman, J., entered March 9, 1921, in favor of the plaintiff, in an action to establish a trust in real property and for an accounting, tried to the court. Affirmed.

*Theodore B. Bruener,* for appellants.

*Wm. E. Campbell* and *James. P. H. Callahan,* for respondent.

TOLMAN, J.—Respondent, as plaintiff, brought this action to recover possession of certain real estate located in the city of Hoquiam, seeking to have appellants C. W. Hodgdon and wife declared to have been trustees in acquiring and holding the legal title thereto, and asking for an accounting from them as to the rents and profits. From a decree holding Hodgdon and wife to be trustees and ordering a reference for the purpose of an accounting, these appeals are prosecuted.

We will consider first the appeal of C. W. Hodgdon and wife. The ultimate facts in the case are singularly free from conflict, though the parties are widely at variance in the conclusions drawn therefrom. It appears that appellant Hodgdon is a reputable attorney of thirty years standing, and that he has practiced his profession at Hoquiam for many years. As early as 1903, Hodgdon was attorney for J. F. Conner in litigation involving the title to the property now in ques-

tion, which litigation lasted about four years and was twice before this court, *Conner v. Clapp,* 37 Wash. 299, 79 Pac. 929, and *Conner v. Clapp,* 42 Wash. 642, 85 Pac. 342, finally resulting in the establishment of Conner's title to the property.

Following the final determination of that case, Hodgdon was instrumental in procuring loans to be made to Conner, secured by first and second mortgages upon the property. Thereafter, as attorney for Conner, he defended an action brought for the purpose of foreclosing a lien against the property, redeemed on behalf of Conner from a judicial sale, prosecuted to a successful outcome an action for an accounting against the purchaser at such sale, and at the second sale in the same case on a deficiency judgment, bid in the property in his own name for the full amount then due, taking a certificate of sale, though he did not go into possession, and thereafter, with money coming into his hands belonging to Conner, he paid off his advances and caused a redemption to be made for and on behalf of Conner. He likewise defended other actions brought against Conner not involving this property, one of which he so defended after he had made the purchase hereinafter referred to. True, he on occasions accepted collections against Conner, and in one instance instituted a suit against him, but it does not appear that it was contested, or that it caused any change in their friendly relations.

In January, 1914, Conner sold a timber claim which he owned in Pacific county, and by arrangements between Conner and the purchaser the entire consideration, $24,000 in cash, was placed in Hodgdon's hands for the purpose of paying off the liens and incumbrances thereon, and Hodgdon therewith paid taxes, judgments, liens and mortgages, clearing the title to

the timber claim, and incidentally relieving the property now under consideration from certain liens and mortgages which were incumbrances upon it as well as upon the timber claim, and with the excess money still remaining in his hands Hodgdon redeemed for Conner from an execution sale to himself, heretofore referred to, and paid a large sum in satisfaction of accrued interest on one of the mortgages on this property. During the latter part of this time, Hodgdon, as attorney for Conner, was defending against an action brought by Lamb and son to recover from Conner for premiums on fire insurance policies covering this particular property. The defense was unsuccessful. Judgment was entered against Conner, from which Hodgdon as Conner's attorney prosecuted an appeal to this court. The judgment was here affirmed, and the remittitur was filed in Grays Harbor county March 20, 1915. An execution was issued against Conner and the surety on his appeal bond for the costs in this court. The surety paid the amount demanded, and Hodgdon, for Conner, reimbursed the surety, with Conner's money. In due time an execution was issued against Conner for the principal judgment in the Lamb case, and thereunder the sheriff duly levied upon the property now under consideration, and gave notice of the sale thereof to be held on May 22, 1915. Plaintiff in the execution gave notice of an application to the court to amend the execution, and Hodgdon, as attorney for Conner, appeared in court on the morning of the day of the sale in response to such notice. At the time and place fixed for the sale there appeared the sheriff, the attorney for the judgment creditor, and Hodgdon, no one else appearing, and Hodgdon then bid in the property in his own name for $415.56, the exact amount due on the execution. On the day of

sale the sheriff issued to Hodgdon a certificate of sale, and he immediately exhibited this certificate to the tenants of the property and notified them that all rents should thereafter be paid to him, and he has ever since been in possession, collecting the rents, and claiming the property as his own.

On June 5, 1915, the sale was duly confirmed; a sheriff's deed issued to Hodgdon on January 5, 1917, which was recorded April 23, 1917. On June 1, 1915, nine days after the sale, and before its confirmation, Hodgdon collected from the tenants of the property which he had thus purchased, rent amounting to $410; leaving at that time due him but $5.56, and a trifle of interest, and by July 1, 1915, he had collected rent in the sum of $845; but before collecting the July rent, and on June 28, 1915, he borrowed upon his personal credit and paid the sum of $1,616 in redeeming from a certificate of delinquency for general taxes against the property, which certificate was not then foreclosable, and would not have been for a considerable time to come. Conner was adjudged insane on April 30, 1917, and committed to the asylum, where he remained without regaining his sanity until his death, which occurred on February 4, 1919. This action was brought on March 17, 1920.

The greatest conflict in the testimony is as to Conner's mental condition at the time Hodgdon purchased the property, and from then on until he was adjudged insane. There is testimony of medical experts to the effect that his malady existed for a year or two years, or perhaps longer, before he was committed, and also testimony to the effect that Hodgdon said, in effect, speaking of the time when the Lamb suit was tried in the superior court, and long before his purchase of the property at sheriff's sale, that Conner acted as

though he had been taking "dope." From the testimony the trial court may well have found that Conner was *non compos mentis* when the sale occurred, and we could not say that the evidence preponderated against such finding; but, as we view the case, it makes little difference whether Conner was then actually insane or not.

It is appellant's first contention that no confidential relation existed between Conner and Hodgdon at the time the latter bought the property at sheriff's sale; that the relation of attorney and client ceased at the time the final judgment was entered against Conner in the Lamb case, and that therefore Hodgdon had the same right to buy for his own advantage at the sale as a stranger would have. Authorities are not wanting which seemingly hold that an attorney for a defendant in a case ceases to be such when the final judgment is rendered against his client; 6 C. J. 672, and cases there cited. So far as we have examined the authorities which apparently so hold, they are cases which deny the binding force of a notice served upon an attorney after the final judgment, or deny the right of an attorney to bind his former client by any act done in the cause after the final judgment, and the like, and none, so far as we are aware, undertake to announce the rule that the confidential relations theretofore existing are presumptively extinguished by the final judgment so as to permit an attorney to use information theretofore gained, by reason of such confidential relation, to his own advantage, or to the disadvantage of his former client. Indeed, in 6 C. J. at page 689, continuing the discussion of "Attorney and Client," the author lays down what we consider to be the rule applicable to the facts here, in these words:

"Where a relation of confidence is once established, either some positive act or some complete case of

abandonment must be shown in order to determine it. The rule must be applied as long as the influence arising from the relationship exists, although this may extend beyond the continuance of the relationship itself, and this doctrine a fortiori must extend to the attorney's settlement with his client of the very fruits of the litigation.''

This rule, we think, is generally followed. At any rate, this court is fully committed to it. *Carson v. Fogg,* 34 Wash. 448, 76 Pac. 112. See, also, *Merritt v. Graves,* 52 Wash. 57, 100 Pac. 164, and *Roger v. Whitham,* 56 Wash. 190, 105 Pac. 628, 134 Am. St. 1105, 21 Ann. Cas. 272. It seems to us uncontrovertible that the confidential relationship is here shown to have existed between Conner and Hodgdon and no abandonment of it or positive act tending towards its severance can be pointed out in the record, and none can be presumed. We are therefore forced to hold that, at the time of the purchase, Hodgdon owed a sacred duty to his former client, whether he was sane or insane.

''Equity regards the relation of attorney and client much in the same light as that of guardian and ward, and will relieve a client from hard bargains or from any undue advantage secured over him by his attorney. But a client will be protected from such abuse of the relation at law as well as in equity.'' 6 C. J. 688.

The property involved is a valuable corner in the heart of the business section of Hoquiam, and by reason of his relations with Conner, Hodgdon knew at the time he purchased it just what incumbrances there were against it, these then amounting to slightly more than $17,000. It is quite possible that at that particular time the property was worth but little more than the amount of these incumbrances. It clearly appears that Conner was largely indebted, probably insolvent, and very likely he would have lost the property in any event, but that does not change the situation, or permit

Hodgdon to gain a profit at the expense of his client by the subsequent appreciation of the property in value. These unfortunate facts are in no wise explained in the record, and must be accepted for present purposes as true. It should be remembered, however, that Hodgdon's mouth has been closed as to these transactions by the death of Conner. This is perhaps a great hardship upon him and may, indeed, be wholly responsible for his present unfortunate situation, but we cannot look beyond the record.

In this connection it is urged that the trial court committed error in refusing to permit Hodgdon, when called as a witness for plaintiff, to testify on cross-examination as to things said by Conner, on re-examination as to conversations which he had with Conner, and also in refusing Hodgdon's offer to prove by his own testimony that, at and about the time of the sheriff's sale, he took the matter of the sale up with Mr. Conner, fully advised him in relation thereto, and that Conner was satisfied that he, Hodgdon, should purchase the property, because Conner was too heavily obligated to handle it. We cannot find that the trial court erred in these rulings. The statute is explicit; Remington's Comp. Stat., § 1211, providing in effect that where the adverse party sues as the legal representative of a deceased person, then ". . . a party in interest or to the record shall not be admitted to testify in his own behalf as to any transaction had by him with or any statement made to him by any such deceased or insane person, . . ." True it is that respondent called Mr. Hodgdon as a witness and examined him as to what he did, but since no attempt was made to examine him as to any transaction had by him with, or any statement made to him by, Mr. Conner, the benefit of the statute was not waived.

Coming now to intervener's appeal:

Albert S. Hodgdon, a brother of appellant C. W. Hodgdon, on June 4, 1908, loaned to J. F. Conner $4,350, secured by a second mortgage upon the property here in controversy. Interest has been paid to some extent upon this note, but the principal has not been paid. Long after appellant C. W. Hodgdon acquired the record title to the property, the first mortgage was released and intervener's second mortgage thereby became a first mortgage, and in 1919 intervener, at the request of his brother, released his mortgage, then a first lien on the property, in order that his brother might borrow $5,000 upon the property and give a first mortgage as security therefor. Intervener took back from his brother a second mortgage to secure the original note, but because of his confidence in his brother did not record the same. At about this time, also, he endorsed upon the note held by him a remission of the interest above five per cent per annum, which he did solely because he looked to his brother as the only source of payment. All of·these facts were set up by a complaint in intervention in this action. After the trial of the cause, Albert S. Hodgdon died, Charles W. Hodgdon duly qualified as executor of his estate and was substituted as intervener. Intervener prosecutes a separate and independent appeal, assigning as error that the trial court erred in refusing to grant any relief to the intervener.

A careful examination of the record convinces us that at this time the intervener has no ground for complaint. The decree from which the appeal is prosecuted is to the effect that C. W. Hodgdon purchased the property in question for the benefit of Conner, thus becoming a trustee, holding the title in trust for Conner and his heirs, and directs that an accounting

be taken. It appears from the record that respondents have at no time contended that intervener should not be paid, and the trial court in his remarks shown in the record indicated that, at the proper time, intervener's rights would be fully protected. It seems to us not improper that the trial court should delay passing upon this feature of the case until an acounting be taken and it be ascertained what, if anything, is owing from appellants C. W. Hodgdon and wife to the respondent on account of rents and profits not already expended in protecting and preserving the property. It may be that from this source there will be sufficient funds to pay intervener in full. If not, intervener's mortgage may be established in its proper rank and made a charge against the property. It is not contended by anyone that the present first mortgage on the property should be affected by this litigation, and since intervener released his then first mortgage without apparently giving notice to the mortgagee in the present first mortgage of its nonpayment, and as he makes no attack upon the present first mortgage, we see no reason why all of his rights cannot be fully protected and established by a final decree to be entered after the accounting is had.

We have purposely delayed the discussion of appellant C. W. Hodgdon's contention that, if the confidential relations did in fact exist, the purchase was not void, but that Conner had the right to claim the benefit of the purchase within a reasonable time thereafter only, and failing to exercise such right, his acquiescence in the purchase will be conclusively presumed, for the reason that, until the decision of the appeal by the intervener, it did not clearly appear in the opinion that there is here no adverse claim based upon the intervening rights of third persons. What is a reasonable

time must always be determined in the light of the facts involved, and in such a case as this, where there are no intervening rights of third persons, equity is slow indeed to hold one, seeking the enforcement of what would otherwise be a just claim, guilty of laches; and if one acts before he is guilty of laches, then he acts within a reasonable time. It is true that the record shows no act done by Conner prior to his commitment evidencing his intention to claim the benefit of the sale, but perhaps his affairs did not then justify his acting, and it appears that, after Mr. Conner was adjudged insane, appellant C. W. Hodgdon refused to pay any part of the rents to his wife, and there is testimony to the effect that he then admitted giving Conner money after his purchase of the property, but claimed such to have been a gift only.

The action was brought within a few days after the expiration of one year from Conner's death, and from a careful examination of the record we cannot say that there was here any unreasonable delay after respondent knew, or should have known, the facts upon which her action is based.

The judgment is affirmed.

MACKINTOSH and MAIN, JJ., concur.

HOLCOMB, J., (concurring)—In concurring with the majority, I wish to add that, under the peculiar circumstances shown herein, the judgment herein should not be considered any reflection upon the professional conduct or personal honor of Judge Hodgdon. He was undoubtedly the attorney for Conner in the case wherein Conner became the judgment debtor, and up to the moment of the amended execution. He bid in the property at execution sale. Ordinarily, in such a case, the law presumes that he acted for his client, and regards him as his client's trustee. 6 C. J. 682.

Unfortunately, it so happened that thereafter the circumstances conspired against the attorney. His client either then was, or shortly thereafter became, incompetent, and so continued until he died. From the first Judge Hodgdon so dealt with the property openly and undisguisedly as his own as to indicate his client's consent to his purchase of the property in his own name. His lips are sealed by the death of his client, and that consent, if given, cannot be convincingly shown. The presumption of law above mentioned is against him.

The relation of attorney and client is one of the highest trust and confidence, requiring from the attorney the most scrupulous good faith toward his client; and, therefore, transactions between them are often declared to be voidable which would be deemed unobjectionable between other persons. 2 R. C. L. 966.

In cases of doubt, therefore, equity and public policy require that the attorney be held accountable to the client.

Nor is the judgment herein burdensome financially. All that is required is that an accounting be rendered of the rents, issues and profits of the property, and all expenditures will be credited, including, I should think, reasonable compensation for the management of the property.

PARKER, C. J., and HOVEY, J., concur with HOLCOMB, J.

FULLERTON, J. (dissenting)—I am unable to concur in the conclusion reached by the majority. In my opinion, it does a grave injustice to an able and distinguished lawyer, now in the decline of life, whose conduct as a practitioner, unless this one act be an exception, has always been above just criticism. I will not quarrel with the recitals of fact made by the majority, although my examination of the record con-

vinces me that, if the settings of many of the facts recited were more fully detailed, they would take from them much of the sting the more brief recital implies. To illustrate my meaning, I may mention the sale of the Pacific county lands. It is true that, when this sale was agreed upon between Mr. Conner and the purchaser, it was a part of the agreement that the purchase price should be paid to Mr. Hodgdon, and that he should take the necessary steps to perfect title in the purchaser; the contract being that the purchaser should have an unincumbered title. This agreement was made without consultation with Mr. Hodgdon, and he first learned of it when the money was brought to him by the purchaser and the purpose of its bringing stated to him. Before paying out the money, Mr. Hodgdon called in Mr. Conner and had him verify the statements of the purchaser. He then proceeded to disburse it in accordance with the directions given him, and no contention is made that he did not faithfully perform the trust.

This transaction is recited, as I understand the majority, not for the purpose of showing a sinister motive on the part of Mr. Hodgdon with relation to the land now in dispute, but for the purpose of showing an unusual relation of trust and confidence then existing between Mr. Conner and Mr. Hodgdon, and as evidence of the existence of such a relation at the time of the purchase made by Mr. Hodgdon of the land in dispute. But I cannot think it has even the remotest bearing on the question. It undoubtedly shows that Mr. Conner, in common with the purchaser, had a just confidence in Mr. Hodgdon's integrity and selected him to do, what the parties themselves could not do, the detail work necessary to a compliance with their agreement. But aside from the fact that the transac-

tion involved a considerable sum of money, there was nothing unusual in it. Similar transactions occur in the practice of every reputable lawyer. More than this, it was the purchaser, and not Mr. Conner, who took the greater risk, if risk there was. He paid the money over to their common agent, and if the agent had failed in the performance of the trust, he, and not Mr. Conner, would have borne the principal loss.

I am aware that the majority have taken the pains to recite that certain of the purchase money was paid on mortgages on the very property which Mr. Hodgdon afterwards acquired. If by this the majority go further than I have assumed they intend to go, then I say they have drawn a wholly unjustifiable inference from the fact. This transaction not only occurred long prior to the purchase made by Mr. Hodgdon, but prior to the time the judgment was obtained under which the property was sold. Seemingly nothing short of prescience could then have made known to Mr. Hodgdon that he would subsequently become the purchaser of the property. So, with the other transactions on which the majority lay stress. As I view them, they are nothing more than the usual and ordinary transactions which occur between all capable lawyers and their clients. While such relations imply trust and confidence with respect to the particular matter in hand, they do not create such a general relation as would forbid a lawyer from dealing with the client, in matters in which he is not employed as an attorney, as he would deal with strangers generally.

But the facts which seem to me to be controlling are facts which the majority do not stress. The record makes it clear that Mr. Hodgdon was never the general attorney of Mr. Conner. While Mr. Conner usually employed him when he needed the services of an attorney, the employment was always for the particular

case, and always ceased with the cessation of the particular case. He was paid no regular retainer, and the record does not disclose that there was even a common understanding between them that he was to be employed when Mr. Conner needed the services of an attorney. This, as I view it, does not create a general trust relationship, such as must be found in order to hold there was a trust relationship with reference to the property in question.

Again, the record discloses that, at the time of the sale of this property, Mr. Conner was utterly and hopelessly insolvent. Not only was the property itself covered with mortgages up to its practical value, but Mr. Conner was otherwise indebted in large sums, a part of which had been reduced to judgments, none of which was subsequently paid. By honest conduct he could not then hope to save to himself any part of the property. Ultimately it must go to the satisfaction of his creditors. To say, therefore, that Mr. Hodgdon purchased this property in trust for Mr. Conner, is to say that he conspired with him to withdraw the property from the reach of Mr. Conner's creditors; in other words, to cheat and defraud them. I can find nothing in the evidence that justifies so grave a charge. Certainly there is nothing in Mr. Conner's conduct to indicate that he so intended. During the years that he subsequently lived he made no claim to the property. At one time when rent was inadvertently paid to him by one of the tenants of the property he returned it to the payer. He told other persons who inquired concerning the property that he had nothing to do with it, and referred them to Mr. Hodgdon as the owner. He paid no part of the indebtedness against the property, either of principal or interest, and his conduct was generally the conduct of one who considered the property as wholly lost to him. As to Mr.

Hodgdon, his conduct with reference to the property has ever been that of an absolute owner. At no time has he recognized that Mr. Conner had an interest in the property, and he has dealt with it in such a manner as not only to involve seriously his own interests, but the interests of other persons who must necessarily suffer thereby if it is property held in trust. Conduct such as this is not the ordinary conduct of men conspiring to cheat and defraud others. Usually there is something in the particular transaction and in the subsequent acts of the parties which point to such a conclusion. Here there is nothing. The whole case rests upon the prior relations of the parties and in them must be found the fraudulent purpose. I cannot believe the evidence justifies such a finding.

Contrary to the conclusion of the majority, I am of the opinion that the trial court unduly limited the testimony of Mr. Hodgdon. Mr. Hodgdon was the first witness called by the representative of the estate. He was made to testify concerning his relations as an attorney with Mr. Conner, even to the fact that he represented Mr. Conner in the action in which the judgment was obtained under which the property was sold, and to the fact that he became the purchaser at such sale. When his own counsel sought to show the entire transaction concerning the sale, the objection of the statute was interposed and sustained by the trial court. In other words, Mr. Hodgdon was compelled to testify to everything which would aid the plaintiff in establishing the claim of the estate against him, and denied the right to testify to those parts of the transaction which tended in his own favor. This, as I understand it, is not the rule, and I believe is contrary to our prior holding in *Robertson v. O'Neill*, 67 Wash. 121, 120 Pac. 884. In that case the representative of a decedent's estate called the adverse party and had him identify

certain checks drawn in the adverse party's favor; the purpose of the testimony being to show that he had received large sums of money belonging to the decedent. The court then permitted the witness to explain why the checks were drawn in his favor and to state that he gave the money which they represented to the deceased. On the appeal this was assigned as error. We, however, held that it was not so, saying that it would be palpably unjust to permit the representative of a deceased person to use the adverse party to the extent that it might aid him in defeating a claim against or in establishing an independent claim in favor of the estate, and then claim the benefit of the statute when the adverse party sought to qualify or explain his testimony; citing a long list of cases in support of the rule. It was further said:

"A like rule applies where the cross-examination is extended beyond the scope of what the witness would have been permitted to testify in chief upon direct examination. *Pierce Loan Co. v. Killian*, 153 Mo. App. 106, 132 S. W. 280; *Edwards v. Latimer*, 183 Mo. 610, 82 S. W. 109; *Edwards v. White* (Tex. Civ. App.), 120 S. W. 914. The logic of the cases is that the party who invokes the protection of the statute must himself respect it."

But it is needless to pursue the inquiry further. In my opinion, there should be a judgment in favor of Mr. Hodgdon, or if not that, a new trial.

MITCHELL, J., concurs with FULLERTON, J.