[No. C.D. 5513.   En Banc.   June 8, 1978.]

*In the Matter of the Disciplinary Proceeding Against* MARIE M. DONOHOE, *an Attorney at Law.*

*Robert T. Farrell,* for Bar Association.

*Marie M. Donohoe,* pro se.

BRACHTENBACH, J.—This is an attorney disciplinary proceeding. Following a complaint against appellant attorney, a hearing panel officer held hearings over a period of 3 days receiving testimony and documentation. The hearing officer entered findings of fact, conclusions and recommendations totaling 24 pages. Appellant attorney was represented by able counsel during those proceedings. The hearing officer recommended one censure and two reprimands. He further recommended that cumulative discipline under DRA 10.1 not be imposed. The disciplinary board adopted the hearing officer's findings, conclusions and recommendations except to modify the recommendations by stating that cumulative discipline would not be imposed but "without prejudice to the application of the rule at a future date if appropriate." We adopt the action of the disciplinary board and approve the imposition of a censure and two reprimands, without prejudice to application of the cumulative discipline rule at a future date if appropriate.

First a procedural matter. The Bar Association has moved to strike appellant's reply brief on the ground that it

was untimely filed and that it contained matters properly belonging in an opening brief which thereby denied the association an opportunity to respond to the matters in the reply brief. Further, the association points out that there are attached to the reply brief "exhibits" which are not part of the record. The association's answering brief was served by mail on September 9, 1977. Appellant did not serve her reply brief until October 20, 1977. Appellant's only response to the motion to strike is that the provisions of DRA do not apply to disciplinary proceedings in the Supreme Court and that the time limits contained in RAP control.

Appellant's position is patently erroneous. The language of DRA 6.4 is perfectly clear and explicitly governs the time period for filing a reply brief in disciplinary matters referred to the Supreme Court. In any event, even if the time limits of RAP control, appellant's reply brief was not timely and contained matters properly belonging in her opening brief. The reply brief is stricken. However, we note that we have reviewed all of the testimony and documents so as to insure appellant a fair review even though she has not followed the applicable rules.

Turning to the merits, appellant's censure was based upon a conflict of interest in client representation in violation of (CPR) DR 5-105. The conflict of interest is apparent from the facts. Appellant attorney obtained a judgment for a client for damages from an assault. The judgment was partially paid, but in the course of collection efforts by appellant attorney, the judgment debtor consulted appellant. By her own testimony, appellant attorney knew that the judgment was not dischargeable in bankruptcy. Yet appellant, without consulting her client, undertook bankruptcy proceedings for the judgment debtor to discharge the remaining unpaid portion of the judgment in favor of her client. Thus an attorney with a partially unpaid, nondischargeable judgment discussed that matter with the judgment debtor. Her own words from the record prove the point:

Q. Did you suggest the bankruptcy possibility to [the judgment debtor]? A. Oh, yes. Q. You suggested it to him? A. Yes. Q. Had he suggested it to you? A. No. I'm sure I suggested it to him. . . . Q. Did you ever in fact tell [the judgment creditor] that you were representing [the judgment debtor] in this proceeding? A. Well, why should I? There was no conflict of interest. . . . Q. So, according to what you said before, at least $80 of this money was owed to [the judgment creditor] and now, through your representation of [the judgment debtor], he has no collectible debt, is that right? A. Sir, this is not a matter for the Bar Association; it's not a disciplinary matter. I don't think it should be inquired into here at all.

Appellant's explanation of her actions is revealing. She contended that most, but not all, of the unpaid judgment was owed to her for her collection efforts, although she had no agreement with her client as to the charge for those efforts.

Her attitude and understanding of legal ethics is reflected in this testimony:

A. Well, I told [the judgment debtor] that he was going to have to pay it, and that I think it's a moral obligation that he owes, and I would tell him to go on paying it. I'm not slippery like you are. Q. Would you tell him it was a legal obligation that he had to pay it? A. I would say it was a moral obligation. I wouldn't say, "Now, look. This is how you can get out of it." No, I'm not that kind of a lawyer. . . . Q. In fact, you admitted that the debt has been discharged, have you not? A. Oh, how long do you want to belabor this point?

Appellant's sole answer to the charge is to allege that the bar did not prove that either of her clients "would have been better off if I had sent [the judgment debtor] to another lawyer." The statement speaks for itself.

A censure is a mild sanction for the patent violation of (CPR) DR 5–105.

Appellant's first reprimand arises from her conduct as a candidate for a position on Division One of the Court of Appeals. She ran in 1974 against incumbent Judge Callow and in 1975 against appointed Judge Andersen.

In the campaign against Judge Callow, appellant issued paid political advertisements stating that "since its inception, Division I of the Court of Appeals has never reversed the trial judge if the appellant was represented by a woman." Appellant herself in fact had obtained a reversal from Division One by a panel on which Judge Callow sat. Additionally there were other published reversals where the successful appellants were represented by women attorneys. Appellant alluded to actions by Judge Callow which in fact were actions of the 3-judge panel. Appellant referred to Judge Callow's refusal to modify "his order" in one of her cases when in fact appellant had never made a motion to the panel for modification, but had merely written to Judge Callow as Acting Chief Judge without even sending a copy of her communication about a pending case to opposing counsel. Other allegations against Judge Callow were misleading, if not false.

Her lack of respect for judicial office is proved by a quotation from her 1974 campaign material:

> If elected, I will be exchanging a life of ease for six years of hard work among colleagues who will hate me. I am willing to make this sacrifice because I believe in the rule of law: that the purpose of appellate courts is to correct the errors of the courts below, not to cover up for them, that in deciding cases, judges must look to the facts and to the law and not to who the attorneys are. I am better educated and more sophisticated than any of the men on that Bench and, if elected, would bring to it qualities that are not there now—respect for persons and reverence for law.

In her campaign against Judge Andersen appellant published a series of false materials, some of which had been used in her campaign against Judge Callow. For example, she set forth facts about a superior court action and then stated that the "Court of Appeals sat on its hands." In fact the court, prior to Judge Andersen's appointment, had granted the relief sought by appellant who represented a party to the litigation.

In another instance she alleged that the Court of Appeals had imposed terms upon her elderly client for delay in perfecting an appeal. She alleged that the terms were imposed even though she offered the sworn statement of the court reporter that he was responsible for the delay. When appellant published that statement she knew that an affidavit had been filed by the court reporter which stated that "the reason the statement of facts was not prepared at an earlier date was due solely to the unusual demands made by Mrs. Donohoe with reference to the preparation of the proposed statement of facts."

In her campaign against Judge Andersen, appellant's materials referred to four cases decided by Division One of the Court of Appeals. The hearing officer determined that these references were intended to lead the reader of those materials to the conclusion that Judge Andersen had made wrongful, unjust and lawless decisions. One advertisement stated: "The incumbent [Judge Andersen] is unlikely to do anything to curb the lawlessness of the judges of the Court of Appeals." In fact appellant knew that Judge Andersen had not participated in any way in those decisions.

Other published statements by appellant include:

In nonjury cases some of the King County Superior Court judges pay no attention to the facts and to the law, but will decide the case on the basis of who the attorneys are. It is useless for a nonestablishment lawyer to appeal the decision, the Court of Appeals will affirm the trial judge in an unpublished opinion.

In a rambling series of comments published by appellant she made the following statements, after referring to the "Scofflaw Judges of King County." (1) "Judge Elston . . . denied attorney's fees to plaintiff." In fact attorney's fees had been awarded to appellant as attorney for plaintiff though offset by damages to defendant. (2) "At the height of the pot scare, the Supreme Court ruled that the Prosecuting Attorney could charge a potsmoker either with a misdemeanor or a felony. If the potsmoker's parents were in a position to make a contribution to the Prosecutor's

campaign fund, it became incumbent upon the defense attorney to call upon him and suggest that the felony charge be reduced to a misdemeanor. Not only has the Supreme Court made one law for the rich and another for the poor, but it has opened the door to corruption of prosecuting attorneys and their deputies."

The hearing officer found that appellant attorney intended to demean the integrity of the judges of the King County Superior Court and of the Court of Appeals and to attribute to those judges lack of respect for the law, discriminatory treatment directed against "nonestablishment lawyers" but that she had presented no evidence in support of those charges.

Based on the foregoing, the hearing officer concluded, and the disciplinary board agreed, that appellant's conduct showed "an intentional and deliberate pattern of making false statements of fact and misrepresenting material facts regarding actions of the Court of Appeals in general, and Judge Keith M. Callow, a candidate for judicial office, in particular, and a deliberate and unsubstantiated attempt to attribute to the Court of Appeals in general and Judge Callow in particular improper motives and a lack of good faith in rendering judicial decisions."

As to her campaign against Judge Andersen, the hearing officer found, and the disciplinary board agreed, that her conduct showed "an intentional and deliberate pattern of making false statements of fact and misrepresenting material facts regarding supposed actions of Judge James A. Andersen, a candidate for judicial office, done with the intent of demeaning Judge Andersen's qualifications for holding such office."

A lawyer's oath as an attorney includes the statement: "I will maintain the respect due to the courts of justice and judicial officers."

Further, the Code of Professional Responsibility provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (CPR) DR 1–

102(A)(4). In addition, the Code of Professional Responsibility provides that a lawyer shall not knowingly make false statements of fact concerning the qualifications of a candidate for election or appointment to a judicial office and a lawyer shall not knowingly make false accusations against a judge or other adjudicatory officer. (CPR) DR 8–102(A) and (B).

These rules permeate all aspects of an attorney's life, whether he be engaged in the active practice of law, campaigning for a political position or adjudicating disputes as a judge.

Further, Canon 7 of the Code of Judicial Conduct provides that a candidate for a judicial office, including an incumbent judge, should maintain the dignity appropriate to a judicial office. Canon 7B(1)(a), CJC. We feel that the minimum dignity appropriate to a judicial office is that the lawyer, judge or judicial candidate abide by the Code of Professional Responsibility.

We are dealing with a delicate balancing of rights involving the public, the incumbent judge, and the lawyer candidate for judicial office. On the one hand the courts, as an institution, are entitled to the respect due to the *office* because the acceptance of judicial decisions ultimately depends upon the citizens' belief in the integrity and impartiality of the courts. On the other hand, the members of the judiciary are subject to legitimate and accurate criticism and evaluation. A candidate for judicial office has a right to challenge an incumbent judge's ability, decisions and judicial conduct, but it must be done fairly, accurately and upon facts, not false representations. The voters are entitled to a fair statement and evaluation of the qualifications of the candidates.

By the attorneys' oath, the Code of Judicial Conduct and the Code of Professional Responsibility the candidates must maintain the respect due the courts of justice. Judges should not be subjected to false allegations about particular decisions. A judge's ability to render a reasoned decision should not be clouded by the fear that a challenger can

twist words or allege distorted facts in an election campaign.

Numerous cases approving discipline for intemperate, inaccurate or unfounded criticism of the courts, creating disrespect or contempt for the judicial institutions or their decisions are collected in an annotation, *Attorney's Criticism of Judicial Acts as Ground of Disciplinary Action,* 12 A.L.R.3d 1408 (1967).

The whole principle has been summarized as follows:

> If running for judicial office, a lawyer may criticize an incumbent judge who is his opponent but the criticism must be well founded, on a high plane, factual, and not personal.

R. Wise, *Legal Ethics* 21 (1966).

Appellant has subverted these purposes by what has been found to be an intentional and deliberate pattern of making false statements of fact. Interestingly, appellant assigns no error to these findings or conclusions. They are supported by substantial evidence justifying the conclusions reached.

Appellant contends that the rules pursuant to which she was disciplined violate her constitutionally guaranteed right to freedom of speech.

We agree that a person does not surrender freedom of expression rights when becoming a licensed attorney. *Spevack v. Klein,* 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625 (1967). However, we do not believe that the First Amendment protects one who utters a statement with knowledge of its falsity, even in the context of a judicial campaign. Such speech is not beneficial to the public and is generally harmful to the person against whom it is directed. The only beneficiary of the comment is the utterer thereof. On balance, such statements are not deserving of constitutional protection.

As noted above, the Code of Judicial Conduct requires a judicial candidate to maintain the dignity appropriate to judicial office. Canon 7B(1)(a). As a minimum, this places

upon that person a burden present regardless of his candidacy—to abide by the Code of Professional Responsibility, including abstention from conduct involving dishonesty. (CPR) DR 1-102(A)(4). One who publishes a statement with knowledge of its falsity during the course of a judicial campaign is subject to discipline pursuant to (CPR) DR 1-102(A)(4).

The hearing officer concluded that appellant had engaged in an "intentional and deliberate pattern of making false statements of fact." We find substantial support in the record for that conclusion.

Appellant's false statements alone are enough to support her reprimand for her campaign conduct. Consequently, we need not decide whether statements made by her found to be simply misleading are constitutionally protected speech. For that reason citation of the facts has not included publications by appellant which could be construed only as misleading. Our affirmance of her campaign conduct reprimand rests on her false statements alone.

The recital of appellant's ethical transgressions is not yet complete. Her second reprimand was received for alteration of a letter written by a fellow attorney. In her campaign against Judge Andersen, appellant came into possession of a letter written by a respected, prominent Seattle lawyer, Paul R. Cressman. Mr. Cressman was Judge Andersen's lawyers' chairman for his campaign. The letter was addressed to fellow lawyers and written on the office letterhead of Short, Cressman and Cable. It contained seven paragraphs. Appellant, without permission, cut, pasted and altered that letter and had it reproduced along with her own campaign statement at the bottom of the page. The doctored document included the original letterhead of Short, Cressman and Cable along with Mr. Cressman's signature. This was then used as a piece of campaign literature.

Appellant removed the essence of three paragraphs. She deleted reference to the King County Bar poll wherein 81 percent had rated Judge Andersen as good or excellent

while she received less than 2 percent in those categories and 55 percent rated her poor. She deleted reference to Mr. Cressman's statement that copies of her publicity releases were available for examination. She deleted Mr. Cressman's statement that the letter was not being sent to law firms with cases under consideration by the Court of Appeals on which Judge Andersen had sat.

Appellant then sent the altered letter to all King County taverns with the hope that it would be publicly posted. Her attitude again is best expressed in her own words from her testimony before the hearing officer.

> Q. Let's assume that you used another letter of Mr. Cressman. Could you tell me the steps you used to produce— A. You bring me this two–page letter—I may have it someplace—that Mr. Cressman wrote. Now, what I did—I mean the next thing was, oh, some holy thing, but, you know, all this stuff, but wouldn't be of interest to anybody. So I took these top three paragraphs and then I took his signature, which was on it at someplace, because Mr. Cressman cannot deny that this is his signature, and I very much resent, counsel, what you are trying to get me into, me guilty of forgery. I had his signature. So then this was photographed, you see, and—
> Q. What do you mean, you took the two three paragraphs? You mean you cut them out of the letter? A. Well, you see, I can't really remember how I did it. I was doing so many things at one time. But you note that—I knew there had to be a signature. Now, I don't know if this was retyped by the print shop or not in smaller type, but I know that definitely Mr. Cressman's signature was on that letter, and this is really silly of you, counsel, to put in as an exhibit an unsigned letter. But the letter that Mr. Cressman sent out was, of course, signed. I think what I did was, I took the first four paragraphs— no, I didn't either. It contains paragraph one, paragraph two, paragraph three. Then I eliminated paragraph four: "Some lawyers are inclined to shrug off the kind of campaign the opposition is conducting as being so wild as to be self–defeating. However, in last year's election, using these same tactics, Mrs. Donohoe came within a few thousand votes of defeating Judge Keith M. Callow and got 46.7 percent of the vote."

Oh, I can remember now, but I insist that Mr. Cressman's signature was on that letter. I mean he certainly wouldn't have sent out an unsigned letter. Q. Well, I would assume, Mrs. Donohoe, that that is the case. A. And so what I did was, I took some paragraphs out and say: "The results of the polls show that a record 81 percent or more rated *Judge Andersen as excellent or good,* whereas, she received a vote of under two percent in the same two categories, and a whopping 55 percent of the vote—members rated her poor." This was really funny, you see, because there is about 3,000 lawyers in the Bar Association and they certainly don't—I only know about maybe 10 or 20; so I don't know how the others decided I was poor.

MR. DIXON: Mrs. Donohoe, if we could move ahead here and answer counsel's questions as to how you composed this.

A. Well, I'm trying to remember, sir. Q. Isn't it a fact, Mrs. Donohoe, that Mr. Cressman never appended his signature to the letter which you prepared? A. Well, every statement in it is his, every one, every one. I omitted some of his statements. Q. Isn't it true that you omitted many of his statements, the ones you did not want to use in your campaign, and then cut his signature out and appended it to the original to make it look like Mr. Cressman authored that entire letter? A. He did author every bit of it, except what is below. Everything in this letter was his. Q. You indicate in your campaign letter marked Exhibit 10 that you had in fact edited Mr. Cressman's letter and taken out what you wanted to take out. A. Why shouldn't I? Everybody edits. It would be—I just took out the interesting part and left out the dull part.

█ The altered Cressman letter clearly falls within the knowingly false, constitutionally unprotected speech category enunciated above.

In short, many of appellant's campaign materials were often false. Her materials were used in this manner in not one, but two campaigns. Her alteration of Mr. Cressman's letter was reprehensible and a fraud upon the voting public. The reprimands were more than justified and constitutionally defensible.

Finally, appellant argues that the proceedings against her should be dismissed because the hearing officer did not file his findings and conclusions within 20 days as provided in DRA 3.2(k)(1). She has neither claimed nor shown any prejudice from the delay. The delay was not unreasonable in view of the necessity of obtaining and reviewing 3 days of testimony, plus the exhibits. That fact, coupled with no claim or showing of prejudice, justifies denial of a dismissal.

The cost bills submitted by the Bar Association, to which appellant has made no objection, are approved.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.