[No. C.D. 6087.   En Banc.   May 12, 1983.]

*In the Matter of the Disciplinary Proceeding Against* GARY G. McGLOTHLEN, *an Attorney at Law.*

*Robert T. Farrell* and *Rhea J. Rolfe,* for Bar Association.

*Velikanje, Moore & Shore, Inc., P.S.,* by *John S. Moore,* for respondent.

UTTER, J.—This attorney disciplinary proceeding presents us with a question of how broadly CPR DR 5-104, the rule governing attorneys' business dealings with clients, should sweep. We must focus on whether to limit the rule's applicability solely to present and clearly defined attorney–client relationships or whether to include less well defined relationships where the attorney's status gives him disproportionate influence. To more effectively protect the public, we choose to paint with the broader brush. In so broadening the rule, we hold that the transaction in this case, an attorney's purchase of property from a client, was subject to CPR DR 5-104. We hold further that the respondent attorney did not satisfy the high standards of disclosure which that rule imposes. Inasmuch as we are announcing a new standard, however, it would be unfair to impose discipline here and hence we refrain from doing so.

In June 1977, respondent, Gary McGlothlen, purchased property from Eileen Ward, the sole heir and former executrix of an estate which McGlothlen was representing in probate. The relationship between McGlothlen and Ward was quite complex and an accurate appreciation of its nature requires a somewhat detailed recounting of its development.

The story begins with the death in 1975 of a Yakima attorney named Perry Woodall. McGlothlen was asked to store Woodall's old files and, as compensation, was told that he could have any future business which arose from the files, assuming the client in question consented. For each file which remained open, McGlothlen wrote to the client summarizing the action which was necessary to close the file and asking the client to contact him about what action to take.

One of the files which came into McGlothlen's possession was a file for the probate of the estate of one John Cole. Cole's wife, who apparently had an interest in the estate or its property, had died during probate and her estate had never been probated. Mrs. Cole's estate named her daughter, Eileen Ward, as sole heir and executrix. Ward was also the sole living heir to Mr. Cole's estate, whether independently or through her mother's interest is unclear.

McGlothlen apparently contacted Delford Woodall, the executor of Mr. Cole's estate, and was asked to bring the estate to a satisfactory close. On July 22, 1975, McGlothlen wrote to Ward, reviewing the file for her, informing her that he was taking it over, requesting her cooperation and assistance, and suggesting that she call him "[i]f [she] ha[d] any immediate legal questions". Report of Proceedings, Exhibit 4. Ward, who lived in California, replied several days later, basically thanking McGlothlen for his assistance. In part, her letter stated:

I sincerely hope you will take care of this matter for me. It is kinda hard for me living in Calif. instead of Wash. I could drop in to see you about the second week in Sept. I had not planned on coming to Toppenish however I can do so if you need to see me.

Report of Proceedings, Exhibit 1. McGlothlen apparently informed Ward that a meeting was unnecessary.

On September 19, 1975, McGlothlen wrote to Ward once more, to notify her that it would be necessary to probate Mrs. Cole's estate as well as that of Mr. Cole. McGlothlen also acted to set up an account in the name of Mrs. Cole's estate. On December 17, McGlothlen wrote to Ward again, informing her that he was able to commence the probate of Mrs. Cole's estate and suggesting that Delford Woodall be substituted as executor. Ward agreed and Woodall was apparently officially substituted at some point, though the record does not indicate when.

At the time she authorized Woodall's substitution as executor, Ward also mentioned that she wished to sell the sole asset of the Cole estates, a house, as soon as possible.

McGlothlen wrote back, offering to help locate a purchaser and asking Ward what price would be acceptable. Apparently, McGlothlen and Ward later spoke on the phone about selling the house and on June 1, 1977, McGlothlen wrote to Ward offering to purchase it himself for $8,500. McGlothlen also offered to draw up the necessary papers, so that Ward would save attorney's fees. He testified at his disciplinary hearing, however, that he intended to act as his own counsel, not Ms. Ward's. Though the house had last been appraised in 1971 for $9,000, it had significantly deteriorated since that time and McGlothlen did not mention the appraisal to Ward. He did describe a recent fire in the house, indicate that it was in very poor shape, and suggest that she check with Delford Woodall if she had any questions about its condition.

Ward agreed to sell her interest in the house for $8,500 and entered into a real estate contract with McGlothlen. A year later, McGlothlen sold the house, also by real estate contract, to the occupying tenant for $14,500. Because McGlothlen's resale was on different payment terms than his purchase from Ward, the hearing examiner found, and we agree, that it is not possible to judge the relative value of the respective real estate contracts.

Soon after McGlothlen's resale, a local real estate broker filed a complaint with the bar association[1] which instituted the present proceeding. The hearing officer concluded (1) that McGlothlen and Ward had an attorney–client relationship; and (2) that CPR DR 5–104, which requires an attorney who enters into a business transaction with a client to make full disclosure, was applicable; but (3) that there had been sufficient disclosure.

Pursuant to DRA 5.2, bar counsel filed an objection to

---

[1] The broker originally claimed that he had told McGlothlen of the tenant's interest prior to McGlothlen's purchase and provided a copy of a letter in which he had allegedly done so. McGlothlen, however, produced the letter which he actually received. That letter said nothing at all about the tenant's interest in the property and left the compelling inference that the copy provided by the broker was a forgery.

this last conclusion with the Disciplinary Board while McGlothlen filed no objections at all. The Board concluded that McGlothlen's disclosure had not been sufficient and recommended that he receive a censure. McGlothlen refused to accept the censure, and the proceeding is now before us. McGlothlen contends that CPR DR 5–104 is not applicable because Ward was not his client and that, even if CPR DR 5–104 were applicable, his disclosure was sufficient.

## I

Bar counsel initially asserts that McGlothlen is precluded from raising before this court any objection to the hearing officer's finding that CPR DR 5–104 is applicable. She points out that McGlothlen had an opportunity to raise this objection before the Disciplinary Board and that his failure to do so waives his right to raise it here.

Prior to review by this court, the findings, conclusions and recommendations of the hearing officer are reviewed by the Disciplinary Board. DRA 5.4. The purpose of this intermediate review is to prevent needless appeals to this court. To assure knowledgeable Board review, DRA 5.2 provides that the parties "shall have the right to file with the Board a typewritten statement in support of or in opposition to the findings, conclusions and recommendation of the [hearing officer]".

Despite its permissive form, we construe DRA 5.2 as mandatory. *Cf. In re Kerr,* 86 Wn.2d 655, 658, 548 P.2d 297 (1976) (construing permissive language of DRA 6.2, governing the raising of issues before the Supreme Court, as mandatory). It not only serves to allow the parties a fair opportunity to present their arguments to the Board, but also allows the Board an opportunity to correct mistakes, thereby avoiding needless appeals. To accomplish this latter purpose, we must require parties to exercise their rights under DRA 5.2 if they wish to preserve error. *Cf.* 2A L. Orland, Wash. Prac. 500 (3d ed. 1978) (purpose of analogous limitation on appellate review is to allow court and

parties below to correct error).

Nonetheless, McGlothlen's failure to object before the Board does not absolutely bar review. A disciplinary proceeding "is not in the nature of an appellate review as that term is generally understood." *In re Sherman,* 58 Wn.2d 1, 8, 354 P.2d 888 (1960), *cert. denied,* 371 U.S. 951 (1963). Thus this court is not entirely bound by traditional rules of appellate practice and we retain discretion to step outside our procedural rules when warranted. For example, in *In re Kerr, supra,* we reached issues raised by the respondent attorney despite his failure to raise formal objections as required by DRA 6.2.

> While we are not obliged to review the findings and recommendations, no objection having been made thereto, we are not powerless to do so. The ultimate responsibility for the discipline of attorneys rests with us, and we would be remiss in our duty were we to accept the recommendations based upon findings which are insufficient on their face.

*Kerr,* at 658. *Accord, In re Sherman, supra* at 8–9; *cf. In re Donohoe,* 90 Wn.2d 173, 175, 580 P.2d 1093 (1978) (would enforce DRA 6.4 regarding timely filing of briefs but "we note that we have reviewed all of the testimony and documents so as to insure appellant a fair review even though she has not followed the applicable rules").

The present case warrants a similar exercise of discretion. The relationship between McGlothlen and Ward was at the outer reaches of CPR DR 5–104. Analysis of McGlothlen's contentions should be instructive and serve to enlighten other attorneys as to the extent of their duties.

## II

CPR DR 5–104 provides:

> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

An attorney is thus obliged to provide "full disclosure" to

another party in a business transaction only if the party (1) is a client; (2) has differing interests; and (3) expects the attorney to protect him or her.

■ Preliminarily, we note our basic approach to construction of the Code of Professional Responsibility. Statutes generally must be construed so as to foster the purposes for which they are enacted (*State v. Coyle,* 95 Wn.2d 1, 5, 621 P.2d 1256 (1980)) and court rules are subject to the same principles of construction as are statutes (*Emwright v. King Cy.,* 96 Wn.2d 538, 544, 637 P.2d 656 (1981)). One of the primary purposes of attorney discipline is the protection of the public from attorney misconduct. *In re McNerthney,* 95 Wn.2d 38, 41, 621 P.2d 731 (1980). We therefore construe our disciplinary rules so as to advance this purpose and accordingly should construe the category of transactions subject to CPR DR 5–104 quite broadly.

It is clear that Ward's interest in the transaction at issue here differed from that of McGlothlen. We also believe that Ward relied upon McGlothlen to exercise his professional judgment for her protection. Her first letter indicated that she was generally relying upon him to handle the estate matters because she lived out of state. McGlothlen then reinforced this reliance by specifically offering to help her find a buyer for the house and offering to draw up the papers when he offered to purchase it.

■ The more difficult question is whether McGlothlen and Ward had a sufficient relationship to bring CPR DR 5–104 into play. Though there is no evidence that there was ever any formal retainer, this is not dispositive. An attorney–client relationship does not require the payment of a fee or formal retainer but may be implied from the conduct of the parties. 7 Am. Jur. 2d *Attorneys at Law* § 118 (1980); 8 J. Wigmore, *Evidence* § 2303, at 584 (rev. 1961). For purposes of claiming the attorney–client privilege, the existence of an attorney–client relationship turns largely on the client's subjective belief that it exists. E. Cleary, *McCormick on Evidence* § 88, at 179 (2d ed. 1972).

In the present case, the parties' conduct indicates that

McGlothlen did become Ward's attorney at least temporarily. The tenor of the letters which they exchanged indicate both that Ward was relying upon McGlothlen's legal expertise and that he made that expertise available to her. She thanked him for his help and "tak[ing] care of this matter for me." He offered to answer any legal questions she might have and advised her as to what action was necessary regarding the two estates. McGlothlen correctly points out that representation of the Cole estates, which he apparently concedes, and simultaneous representation of Ward, the ultimate heir, could have violated CPR DR 5–105, governing representation of conflicting interests.[2] This argument ignores two important facts, however. First, it may simply be that McGlothlen did violate CPR DR 5–105, though it appears to us that any such violation in the present case would be largely technical. Second, McGlothlen neglects to note that for several months prior to Woodall's substitution, Ward was the executrix of Mrs. Cole's estate. During this period at least, therefore, McGlothlen was representing Ward as executrix of Mrs. Cole's estate and hence they had an attorney–client relationship.

■ At what point this relationship ended, we believe irrelevant. CPR DR 5–104 is applicable as long as the influence arising from an attorney–client relationship continues. The rule on its face does not specify whether it is limited solely to transactions with persons who are *presently* clients. Outside the attorney discipline setting, however, the fiduciary duty of an attorney extends beyond the immediate attorney–client relationship.

"Where a relation of confidence is once established, either some positive act or some complete case of abandonment must be shown in order to determine it. The

---

[2]CPR DR 5–105 prohibits the representation of multiple clients if such representation is likely to adversely affect the lawyer's professional judgment, unless each client consents after full disclosure. Thus, there would have been a violation in the case at bar only if the interests of Ward and the estates were likely to conflict and McGlothlen had not fully disclosed this possibility. We need not address the issue here since no violation of CPR DR 5–105 has been alleged.

> rule must be applied as long as the influence arising from the relationship exists, although this may extend beyond the continuance of the relationship itself, . . .

*Conner v. Hodgdon,* 120 Wash. 426, 431–32, 207 P. 675 (1922). The same reasoning is appropriately applied to CPR DR 5–104. Otherwise, attorneys could avoid the requirements of the rule by simply delaying formal completion of the subject transaction until their employment was terminated.

In the case at bar, McGlothlen retained great influence over Ward at the time he purchased the house, even if their relationship as attorney and client had ended. He continued to communicate with and assist Ward regarding the house, even after Woodall was substituted as executor of Mrs. Cole's estate. One highly pertinent factor in judging the continued influence of an attorney is whether he or she has been replaced by another attorney. Annot., 20 A.L.R.2d 1280, 1313 (1951). Here there was no evidence of such replacement—indeed, McGlothlen indicated to Ward at the time of his purchase that she need not get an attorney of her own. In the circumstances of this case, McGlothlen retained sufficient influence over Ward at the time of the transaction in question to make CPR DR 5–104 applicable.

## III

█ CPR 5–104 does not absolutely prohibit transactions between an attorney and his client, but merely requires "full disclosure". The hearing officer concluded that McGlothlen's disclosure was sufficient but the Disciplinary Board concluded otherwise. We attach the greater weight to the conclusions of the Board (*In re Zderic,* 92 Wn.2d 777, 784, 600 P.2d 1297 (1979)); however, we must review even those conclusions (*In re Kerr,* 86 Wn.2d 655, 659, 548 P.2d 297 (1976)).

█ The disclosure which accompanies an attorney–client transaction must be complete. Moreover, the burden upon the attorney defending his or her actions is a great one.

"So strict is the rule on this subject that dealings between an attorney and his client are held, as against the attorney, to be prima facie fraudulent, and to sustain a transaction of advantage to himself with his client the attorney has the burden of showing not only that he used no undue influence but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger." 7 C. J. S., Attorney and Client, § 127.

*In re Beakley,* 6 Wn.2d 410, 423–24, 107 P.2d 1097 (1940); *In re Lovell,* 41 Wn.2d 457, 458–59, 250 P.2d 109 (1952). Thus, an attorney attempting to justify a transaction with his or her client has the burden of showing (1) there was no undue influence; (2) he or she gave the client exactly the same information or advice as would have been given by a disinterested attorney; and (3) the client would have received no greater benefit had he or she dealt with a stranger.

Though McGlothlen's conduct as measured against ordinary standards was entirely proper, it did not meet the stringent requirements imposed upon an attorney dealing with his or her client. First, McGlothlen did not show that Ward could not have received any greater benefit by dealing with a stranger. There is no showing that Ward could not have found a buyer on the same terms under which McGlothlen sold the house a year later. While the hearing officer was unable to judge the relative value of the two real estate contracts, the burden of proof, which he failed to carry, is on McGlothlen.

McGlothlen also failed to provide Ward with sufficient information and advice to satisfy the requirements of CPR DR 5–104. McGlothlen said nothing at all to Ward about the 1971 appraisal of the house. While the intervening deterioration in the house's condition may have rendered that appraisal largely meaningless, a disinterested attorney would in all likelihood have had a new appraisal done. Moreover, in his offer to purchase the house, McGlothlen

emphasized only its run-down condition—a disinterested attorney would probably have provided significantly greater detail.

McGlothlen's disclosure did not satisfy the stringent requirements of CPR DR 5-104. Since we have also held that the rule was applicable, we must further conclude that McGlothlen has violated the Code of Professional Responsibility.

## IV

The recommendation of the Disciplinary Board is that McGlothlen receive a censure. While we give serious consideration to the Board's recommendations, we have the ultimate responsibility for deciding the appropriate sanction for attorney misconduct. *In re Nelson,* 87 Wn.2d 77, 80-81, 549 P.2d 21 (1976).

Few of our prior cases have dealt with violations of the conflict of interest rules. This may be because such misconduct standing alone tends to be treated with relative lenience and because discipline falling short of suspension or disbarment need not be approved by this court (*see* DRA 5.6(e)). In *In re Donohoe,* 90 Wn.2d 173, 580 P.2d 1093 (1978), we approved a recommendation of only a censure for what we termed a "patent violation" of CPR DR 5-105, another conflict of interest rule. *Donohoe,* at 176. This was despite the fact that the censure was accompanied by reprimands for two other instances of misconduct. *Donohoe,* at 174.

In the instant case, still greater leniency is justified. Of greatest importance is the borderline nature of McGlothlen's conduct. Given the relatively undefined nature of McGlothlen's relationship with Ward, his conduct can hardly be termed a "patent violation" as was the misconduct in *Donohoe.* In similar circumstances in the past, we have completely foregone the imposition of sanctions. *See, e.g., In re Smith,* 42 Wn.2d 188, 197, 254 P.2d 464 (1953) (because the unethical nature of contingent fees in divorce cases had not been previously decided, no repri-

mand issued).

A second factor justifying leniency is that McGlothlen appears to have acted in good faith and with honest intent and there is no evidence that Ward was or felt harmed. The only complaint about his conduct arose from a local real estate agent with whom McGlothlen was apparently feuding and who, in his efforts to see McGlothlen disciplined, submitted highly questionable documents to the bar association.

Finally, we note that McGlothlen has never previously been disciplined. In addition, we are convinced, in part by his appeal to this court of a relatively minor sanction, that his mere involvement in a disciplinary proceeding has significantly embarrassed him.

In light of these circumstances, we will impose no sanctions in this case. We do emphasize, however, that the category of transactions subject to CPR DR 5-104 is to be construed broadly and, having made this clear, we shall not be so lenient in the future. In addition, because McGlothlen's conduct did violate CPR DR 5-104, we will impose costs of $694.67 pursuant to DRA 7.1(c).

WILLIAMS, C.J., BRACHTENBACH and DOLLIVER, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (dissenting)—Martha Cole died, leaving her entire estate to her daughter, Eileen Ward, whom she nominated as executrix of her will. Attorney McGlothlen solicited the probate from Eileen Ward and, because she was an out-of-state resident, substituted Delford Woodall as executor of the Martha Cole estate. This was unnecessary, as he could have simply qualified Eileen Ward as a nonresident executrix and appointed himself or Woodall as her statutory agent to represent the estate. This could have been accomplished under RCW 11.36 ("Qualifications of Personal Representatives") which provides in part, in section .010, as follows:

A nonresident may be appointed to act as personal rep-

resentative if he shall appoint an agent, who is a resident of the county where such estate is being probated, or, who is an attorney of record of the estate, upon whom service of all papers may be made; . . .

Had McGlothlen appointed Ward as out–of–state executrix and himself or Woodall as statutory agent, everyone would admit that an attorney–client relationship continuously existed between McGlothlen and Ward. But by securing the appointment of Woodall instead of Ward as executor, he contended that no attorney–client relationship existed between himself and Ward, and that in buying the estate property, an arms–length relationship existed between buyer and seller and he owed no duty whatsoever to Ward to make a full disclosure. In summary, McGlothlen claims he was attorney for Woodall and the estate but not Ward. However, in spite of Woodall's appointment, there is substantial evidence in the record that the attorney–client relationship between McGlothlen and Ward continued throughout this entire transaction. The initial letter written by McGlothlen to Ward dated July 22, 1975 (exhibit 4), in which McGlothlen explains the circumstances of his having the estate file, stated, "If you have any immediate legal questions do not hesitate to call me for an appointment". Ward's immediate response dated July 25, 1975 (exhibit 9) states, "I sincerely hope you will take care of *this matter for me*". (Italics mine.)

A letter dated September 19, 1975, to Ward from McGlothlen (exhibit 5) gives more substance to the attorney–client relationship between them. In it, McGlothlen explains that the proceeds from the rental of the house would be forwarded to Ward after he deducts the cost of administration of the estate.

Further evidence can be found by the fact that McGlothlen handled the transfer of the property himself. In his letter offering to purchase the house (exhibit 3), McGlothlen states:

By accepting my Offer of Purchase, you have no real estate broker fees to pay, which are estimated at 7% *nor*

*do you have any other attorney fees for this sale.* This, of course is a savings to you.

(Italics mine.)

Most illuminating on this issue, however, is McGlothlen's own admission, in a letter to the bar association dated May 8, 1981 (exhibit 2), in which he states:

Mrs. Ward was the sole heir of the estate. In 1975 she advised that Mr. Woodall had not advised her as to what was occurring with regard to her mother's estate *and she retained me* to complete the probate of both estates.

(Italics mine.)

CPR DR 5–104 is applicable to the subject case. CPR DR 5–104(A) states:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The great importance of the duty of an attorney to a client in a business transaction is discussed in the case of *In re Beakley,* 6 Wn.2d 410, 423–24, 107 P.2d 1097 (1940). That case involved several charges for which the attorney was disbarred. One charge involved the attorney's business transactions with a client. This court addressed that issue at length. Terming the attorney–client relationship "one of the strongest fiduciary relationships known to the law", the court then quotes 7 C.J.S. *Attorney and Client* § 127.

"The relation of attorney and client has always been regarded as one of special trust and confidence. The law therefore requires that all dealings between an attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them. So strict is the rule on this subject that dealings between an attorney and his client are held, as against the attorney, to be *prima facie fraudulent,* and to sustain a transaction of advantage to himself with his client *the attorney has the burden* of showing not only that he used no undue influence but that he gave his client all the information and advice which it would have been his duty to give if he

himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger."
(Italics mine.)

McGlothlen had no right to rely on a year–old Yakima County Assessor's appraisal of the property, but had a duty to retain an independent appraiser to secure an updated market value of the purchased home, or at least to consult a local realtor as to the present market value of the home. He then should have conveyed all of such information to the seller, Ward, so she could intelligently know whether McGlothlen was offering her a fair price for her home. One reading McGlothlen's letter to Ward could infer that the property had been appraised at $9,000 the previous year, yet not know that assessors' appraisals traditionally are below market value.[3] This is best illustrated by the fact that the home sold to McGlothlen for $8,500 was sold, as is, a year later for $14,500. Perhaps if McGlothlen had made a complete disclosure to Ward she could have sold her home for $14,500, rather than for $8,500 to her attorney.

The majority states at page 525, "McGlothlen's conduct as measured against ordinary standards was entirely proper . . ." Based on the subject record, this is an incredible statement. McGlothlen was not fair; he failed to disclose full information to his client as to the market value of the home, and personally profited handsomely as a result of his deception and breach of his professional responsibility. This is not proper measured against any standards.

## CONCLUSION

The Board of Governors found that an attorney–client relationship existed at all times between McGlothlen and Ward during the subject real estate transaction; that

---

[3]Real estate tax ratios in Yakima County in 1979 were 76.1 percent. In 1979, an average home in Yakima with a market value of $12,000 would be assessed at a ratio of 76.1 percent, being a market value of $9,120. Department of Revenue and Office of State Auditor publication, July 1981, "Property Tax Ratios by County, Table 20," *1980 Property Tax Collections and Levies Due in 1981.*

McGlothlen violated the Code of Professional Responsibility for attorneys (CPR DR 5–104(A)) by failing to make a complete disclosure as mandated; and recommended a censure. I agree, except as to the sanction.

Rather than a censure, I would suspend McGlothlen from the practice of law for at least 90 days, which would reflect the seriousness of his violation of his obligation to his client.

DIMMICK, J. (dissenting)—I concur in the analysis of the dissent by Dore, J. However, I see no compelling reason to deviate from the recommendation of the Disciplinary Board.

STAFFORD and PEARSON, JJ., concur with DIMMICK, J.