**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WASHINGTON, Petitioner–Appellee,**

v.

**John Jarrette SANDLIN, Respondent–Appellant.**

**No. 91–36251.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1993.

Decided Dec. 20, 1993.

John Jarrette Sandlin, pro se.

Douglas Letter, U.S. Dept. of Justice, Washington, DC, for petitioner-appellee.

Before: BRUNETTI, LEAVY, and TROTT, Circuit Judges.

LEAVY, Circuit Judge:

John Jarrette Sandlin (Sandlin) appeals the district court's order suspending him from practice as a member of the bar of the United States District Court for the Eastern District of Washington for six months for violating Rule 1.2(f)(2) of the Local Rules of that court and Rule 8.2(a) of the Rules of Professional Conduct of the Washington State Bar Association by stating, falsely or with reckless disregard as to the statements' truth or falsity, that United States District

Judge Alan A. McDonald ordered his court reporter to materially alter a hearing transcript and tape recording. We AFFIRM.

## BACKGROUND

The genesis of this unfortunate incident is Sandlin's unsuccessful attempt to have United States District Judge Alan A. McDonald recused in a civil case in which Sandlin served as defense counsel. During a hearing on a temporary restraining order, Richard Allen Smith (Smith), Chief Executive Officer of a plaintiff corporation, was called as a witness. As Smith approached the witness stand, he and Judge McDonald exchanged a greeting which according to Sandlin appeared to be that of friends. Based on his observations, Sandlin began questioning Smith about his relationship with Judge McDonald. Judge McDonald stopped Sandlin's inquiry, commenting that Sandlin was "not conducting discovery in this Court as a basis for a motion for recusal." Sandlin then asked Judge McDonald to divulge any personal relationship he had with Smith. Judge McDonald responded:

> The Court does not feel the least bit uncomfortable on sitting on this matter. The Court has known Mr. Smith and his brother. The Court has had the distinct honor of knowing their father before them and would expect them to *expect* that this Court would rule impartially without any concern about that fact at all. Now, get on to the issues of the case.

(Emphasis added.)

Sandlin filed a recusal motion. His motion was based, in part, on the affidavit of his client, John E. Strait (Strait), who averred that, during the TRO hearing, Judge McDonald "gave his opinion that he believed Richard A. Smith would be honest and tell the truth, or words to that effect." Sandlin's motion was also based upon the fact that, prior to becoming a United States District Judge, Judge McDonald had represented Smith's brother in a wrongful death action following the death of his son. Because the parties disputed what was said during the hearing, United States District Judge Justin L. Quackenbush, who presided over the recu-

sal motion, ordered a transcript. In it, Judge McDonald is reported as saying:

> The Court does not feel the least bit uncomfortable on sitting on this matter. The Court has known Mr. Smith and his brother. The Court has had the distinct honor of knowing their father before them and would expect them to *know* that this Court would rule impartially without any concern about that fact at all. Now, get on to the issues of the case.

(Emphasis added.) Judge Quackenbush denied Sandlin's recusal motion, finding that "the record does not support the claim that Judge McDonald indicated at the TRO hearing that he was predisposed to believe that Mr. Smith will tell the truth."

Sandlin moved for reconsideration. Prior to the hearing on his motion, Sandlin listened to the tape recording of the TRO hearing. Kaye Blankenship (Blankenship), Judge McDonald's court reporter, was present when Sandlin listened to the tape recording. She told Sandlin that she made certain editorial changes in the transcript at Judge McDonald's direction. In moving for reconsideration, Sandlin asserted that both the tape recording of the TRO hearing and the transcript of that hearing were "materially inaccurate" in that "where Judge McDonald said he knew that Mr. Smith would tell the truth or that he wouldn't lie, and my immediate response where I said, 'Well, I believe Mr. Smith would tell the truth, at least I hope so,' are missing."

Because Blankenship was reported to have stated that she made changes in the transcript, Judge Quackenbush allowed Sandlin to depose her. During her deposition, Blankenship testified that her practice was to submit transcripts to Judge McDonald prior to filing them. Blankenship also said that, on Judge McDonald's order, she changed "would expect them to *expect*" to "would expect them to *know*" in the TRO hearing transcript. She said she did not delete any language from the transcript as alleged by Sandlin.

Before Blankenship's deposition, Sandlin had telephoned FBI Agent John Detlor (Detlor). The district court found that Sandlin told Detlor that the transcript of the TRO

hearing was inaccurate, and that Judge McDonald ordered Blankenship to alter the transcript by purging it of the Judge's statement regarding the veracity of the adverse witness. Detlor reported Sandlin's allegations to his supervisor, Jason Moulton (Moulton). Moulton telephoned Sandlin, who repeated his allegations.

Sandlin also telephoned William Beatty, an Assistant United States Attorney (AUSA) for the Eastern District of Washington. The district court found Sandlin told Beatty he wished to report a "tampering with the evidence" by Judge McDonald. He then repeated his allegations regarding alteration of the TRO hearing transcript, adding that Judge McDonald's conduct was criminal and should be prosecuted. Sandlin stated he had retained two tape recording experts, who would find that the tape recording of the TRO hearing had also been altered.

Judge Quackenbush had allowed Sandlin to listen to the tape recording of the TRO hearing with his experts, both employees of the local television station. The affidavits of both men essentially agreed that, although "there was a distinct possibility of an audio edit," there "was not the certainty of one." Both suggested additional testing. Despite this suggestion, Sandlin telephoned John Lamp, United States Attorney for the Eastern District of Washington. The district court found Sandlin repeated to Lamp his allegations regarding Judge McDonald's material alteration of the TRO hearing transcript. Sandlin also informed Lamp that his experts had *confirmed* that the tape recording of the hearing had been altered and that he was certain Judge McDonald had ordered the alterations.

As a result of Sandlin's allegations made to United States Attorney Lamp, a Grand Jury subpoena was issued for Blankenship's stenotype notes and the tape recording of the hearing. An independent examination of both revealed no alteration. The FBI informed Sandlin that, having found no basis for Sandlin's allegations that the tape recording and stenotype notes had been altered, its investigation was closed.

Judge McDonald thereafter filed a Petition for Disciplinary Action accusing Sandlin of violating Rule 1.2(f)(2) of the Local Rules (L.R.) of the United States District Court for the Eastern District of Washington and Rule 8.2(a) of the Rules of Professional Conduct of the Washington State Bar Association (WSRPC). L.R. 1.2(f)(2) requires that attorneys appearing before the United States District Court for the Eastern District of Washington observe the WSRPC. WSRPC 8.2(a) states:

> A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications, integrity, or record of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

A hearing was held on Judge McDonald's disciplinary petition. The district court found that Sandlin had no reasonable basis in fact for making his statements to FBI Agents Detlor and Moulton and AUSA Beatty regarding Judge McDonald's intentional alteration of the transcript and tape recording. The district court further concluded that Sandlin's statements to United States Attorney Lamp were made without any basis in fact and with reckless disregard as to their truth. Finally, the court found that Sandlin's statements to United States Attorney Lamp that his two experts had *confirmed* the alteration of the tape recording were knowingly false. These facts, the district court concluded, were established by a clear preponderance of the evidence and ordered that Sandlin be suspended from practice for six months.

In his appeal, Sandlin contends he did not violate WSRPC 8.2(a) or, if a violation occurred, no sanction is allowed because his speech is protected by the First Amendment.

## DISCUSSION

### I. *Standard of Review*

 This Court reviews a district court's findings of fact in support of a disciplinary order for clear error. *See Standing Comm. on Discipline of the United States Dist. Court for the S. Dist. of Cal. v. Ross,*

735 F.2d 1168, 1170 (9th Cir.), *cert. denied,* 469 U.S. 1081, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984). The district court's choice of sanction is reviewed for abuse of discretion. *Id.* at 1172. *See also Re Patterson,* 176 F.2d 966, 967 (9th Cir.1949); *Re Claiborne,* 119 F.2d 647, 650–51 (1st Cir.1941).

 Legal and constitutional questions are reviewed *de novo. See Re Complaint of McLinn,* 739 F.2d 1395, 1398 (9th Cir.1984) (en banc). In cases like this raising First Amendment issues, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Gentile v. State Bar of Nevada,* — U.S. —, —, 111 S.Ct. 2720, 2726, 115 L.Ed.2d 888 (1991) (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984)).

## II. *Analysis*

### A. *Burden of Proof*

 Before reaching Sandlin's arguments under the disciplinary petition and the First Amendment, we discuss his contention that the district court erred in applying a clear preponderance standard to the evidence in this case. Sandlin argues that the correct standard is clear and convincing evidence premised on the fact that WSRPC 8.2(a) incorporates the actual malice standard of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)—to be sanctioned, an attorney's statement must be false or made with reckless disregard as to its truth or falsity. He cites *Bose,* in which the Supreme Court noted that the burden of proving actual malice in a defamation case is clear and convincing evidence that the defendant realized his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. 466 U.S. at 511 n. 30, 104 S.Ct. at 1965 n. 30.

Under Washington law, the standard to be applied in disciplinary hearings is a "clear preponderance" of the evidence. The Washington Rules of Court state:

Burden of Proof. Disciplinary counsel shall have the burden of establishing an act of misconduct by a clear preponderance of the evidence.

RLD 4.11(b). *See also Matter of Allotta,* 109 Wash.2d 787, 748 P.2d 628, 630–31 (1988) (en banc). While the standard in defamation cases involving members of the general public is clear and convincing evidence, "[a]s officers of the court, lawyers do not stand in the shoes of ordinary citizens." *Matter of Westfall,* 808 S.W.2d 829, 836 (Mo.) (en banc), *cert. denied,* — U.S. —, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991). As the Washington Supreme Court aptly stated in *Allotta:*

> [The] "[c]lear preponderance" ... standard reflects the unique character of disciplinary proceedings. The standard of proof is higher than the simple preponderance normally required in civil actions because the stigma associated with disciplinary action is generally greater than that associated with most tort and contract cases. Yet because the interests in protecting the public, maintaining confidence, and preserving the integrity of the legal profession also weigh heavily in these proceedings, the standard of proof is somewhat lower than the beyond reasonable doubt standard required in criminal prosecutions.

*Allotta,* 748 P.2d at 630–31.

### B. *Disciplinary Petition*

The disciplinary petition charged Sandlin with making "a public, false and malicious attack on a judicial officer." Tracking this language, Sandlin contends that his statements were not (1) public, (2) false and malicious, or (3) an attack on a judicial officer. We discuss the first and third of these arguments, leaving the second to our discussion of Sandlin's argument under the First Amendment.

Sandlin concedes that WSRPC 8.2(a) is not by its terms restricted to public statements. He argues, however, that that is the charge brought against him and that is how this rule and its predecessors have been applied. *See In re Kaiser,* 111 Wash.2d 275, 759 P.2d 392 (1988) (construing judicial canons); *In re Donohoe,* 90 Wash.2d 173, 580 P.2d 1093 (1978)

(construing DR 8–102(B)). Sandlin claims that, absent the filing of the petition, the issues raised by that petition would not have been brought to the public's attention.

We reject Sandlin's argument. While the disciplinary petition did charge Sandlin with making a public statement, it also referred to WSRPC 8.2(a), which contains no requirement that the statement at issue be made publicly. Cases such as *Kaiser* and *Donohoe* do involve public statements—*e.g.*, campaign advertisements. However, neither case was decided under WSRPC 8.2(a). Moreover, neither opines that WSRPC 8.2(a) applies only to public statements.

Sandlin also argues that he did not accuse Judge McDonald of altering the record; rather, his "attack" was on Blankenship. He points out that the disciplinary petition does not charge him with attacking *Judge McDonald*, but rather, with attacking a *"judicial officer."* Sandlin argues that before he can be punished for statements critical of a particular government official, he must *specifically* identify that official as the target of his criticisms.

Sandlin correctly notes that the disciplinary petition does not specifically charge him with attacking Judge McDonald. However, a fair reading of that petition reveals that Sandlin was charged with violating WSRPC 8.2 by making false statements about Judge McDonald.

Sandlin's argument that his attack was actually on Blankenship does find some support in the record. For example, the FBI's complaint form lists "Kay Blankenship" under "Subject's name and aliases." That complaint states that Sandlin alleged "that Judge MacDonalds (sic) clerk (sic) recorder intentionally deleted the (unreadable) comment from the transcript." Nonetheless, the record also supports the district court's finding that Sandlin stated to FBI Agents Moulton and Detlor, AUSA Beatty, and USA Lamp that *Judge McDonald* ordered Blankenship to materially alter the transcript of the May 8th hearing. As such, we cannot say the district court clearly erred in finding that Sandlin's attack was directed at Judge McDonald.

### C. *First Amendment*

■ Sandlin contends that, even if his statements violate the strict terms of WSRPC 8.2(a), there is no violation because his statements are protected under the First Amendment. The Supreme Court has recently stated that "disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and [the] First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law." *Gentile*, —— U.S. at ——, 111 S.Ct. at 2734. *See also Kaiser*, 759 P.2d at 397. Nonetheless, once a lawyer is admitted to the bar, although he does not surrender his freedom of expression, he must temper his criticisms in accordance with professional standards of conduct.

WSRPC 8.2(a) does not prohibit all lawyer criticism of judges, only that which is false or is made with reckless disregard for its truth or falsity. Sandlin contends that his statements were not false and malicious because: (1) Blankenship admitted the transcript was, in fact, edited; (2) his attribution of statements to Judge McDonald were made in the good faith belief they occurred; and (3) witnesses verified his memory of the colloquy in which Judge McDonald allegedly stated his belief in the veracity of the adverse witness.

■ Sandlin's first argument is without merit. It cannot be disputed that editing of an official court transcript without the consent of the parties is prohibited. However, Sandlin contends he cannot be disciplined for his allegations regarding alteration of the record because Blankenship admitted to making editorial changes—*e.g.*, substituting "know" for "expect" in "expect them to know." From this, Sandlin concludes that his assertion that the transcript was not verbatim was correct. As the Government points out, this was not the only alteration Sandlin complained of. In a hearing before Judge Quackenbush, Sandlin himself stated that if the only change made was the substitution of "know" for "expect" that "by itself would not cause me any concern at all." That said, we do not condone editing *in any form* of official transcripts. We merely find

that Sandlin's allegations were broader than argued by him.

■ In support of his argument that his statements were made in good faith, Sandlin points out that he took, and passed, two polygraph tests. He also points out that his memory of the TRO hearing agreed with that of his wife, his client, and his former law clerk, all of whom were present at the hearing. Sandlin contends the findings of the two television employees who reviewed the tape recording of the hearing only "bolstered" his belief that he remembered his colloquy with Judge McDonald correctly. He contends that, even if his statements were false, he cannot be punished absent proof that they were made with actual knowledge of their falsity. Sandlin concedes that, under *New York Times*, reckless disregard for the truth of a statement will suffice. He argues, however, that, under Washington law, only knowledge of actual falsity meets the standard. In support, Sandlin cites *Kaiser*, 111 Wash.2d 275, 759 P.2d 392 (1988) (en banc).

*Kaiser* was a judicial disciplinary proceeding. The Washington Supreme Court noted that, under its decision in *Donohoe*, an attorney discipline case, statements lost their First Amendment protection where those statements were made with actual knowledge of their falsity. *Donohoe* was decided under DR 8–102, which reads: "A lawyer shall not *knowingly* make false statements of fact concerning the qualifications of a candidate for election or appointment to a judicial office." (Emphasis added.) After *Donohoe*, Washington adopted WSRPC 8.2, which is based on the ABA's Model Rules of Professional Conduct (RPC). WSRPC 8.2(a) differs from DR 8–102 in its scienter requirements: specifically, WSRPC 8.2 incorporates the broader intent standard of *New York Times*.

■ In the defamation context, we have stated that actual malice is a *subjective* standard testing the publisher's good faith belief in the truth of his or her statements. *Crane v. Arizona Republic*, 972 F.2d 1511, 1523 (9th Cir.1992). The Supreme Courts of Missouri and Minnesota have determined that, in light of the compelling state interests served by RPC 8.2(a), the standard to be applied is not the subjective one of *New York Times*, but is objective. *Westfall*, 808 S.W.2d at 837; *In re Disciplinary Action Against Graham*, 453 N.W.2d 313, 322 (Minn.), *cert. denied*, 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990). We agree. While the language of WSRPC 8.2(a) is consistent with the constitutional limitations placed on defamation actions by *New York Times*, "because of the interest in protecting the public, the administration of justice, and the profession, a purely subjective standard is inappropriate." *Westfall, id.* at 837. Thus, we determine what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances.

■ Using this standard, we find the district court did not err in finding Sandlin violated L.R. 1.2(f)(2) and WSRPC 8.2(a). The district court found *as a factual matter* that, at the time he made his statements to FBI agents Detlor and Moulton and AUSA Beatty that Judge McDonald intentionally altered the TRO hearing transcript and tape recording, Sandlin had no reasonable basis in fact for making these statements. Sandlin's statements to USA Lamp, the district court concluded, were made without any basis in fact and with reckless disregard as to the truth thereof. The district court did not clearly err in its findings. Without waiting to depose Blankenship, Sandlin telephoned the FBI and alleged that Judge McDonald had ordered Blankenship to alter the transcript by purging it of Judge McDonald's statements of his belief in the veracity of the adverse witness. Sandlin later telephoned AUSA Beatty, repeating his allegations and stating that Judge McDonald's conduct was criminal and should be prosecuted. *Compare Westfall*, 808 S.W.2d at 838 (in assessing appropriate sanction for violation of RPC 8.2(a), court noted that respondent did not accuse judge of criminal conduct). Even absent Sandlin's statements regarding alteration of the transcript, a finding of a violation of WSRPC 8.2(a) is warranted. The district court found that Sandlin knowingly made false statements to USA Lamp that his two experts had *confirmed* the alteration of the tape recording. We cannot say the district court clearly erred in this finding.

Since we find no abuse of discretion in the district court's choice of sanction, the district court's order is

AFFIRMED.

TROTT, Circuit Judge, Concurring and Dissenting:

A judge must not only be impartial in his or her approach to a case, but a judge must also avoid the *appearance* of partiality. Canon 2 B. of the Code of Conduct for United States Judges reads in relevant part as follows:

> A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. [A judge should not] convey ... the impression that they are in a special position to influence the judge.

As Charles Alan Wright puts it, "Because the federal judge is given such extensive power over litigation before him, it is especially important that he not only be *but seem impartial.*" Wright, "Law of Federal Courts," § 97 (emphasis added). 28 U.S.C. § 455(a) pertaining to the disqualification of a judge says, "Any ... judge ... shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Anything less than this antiseptic approach to judging undermines public confidence in our system of justice, and without public confidence in the basic fairness of our system, it would soon crumble. This is one of the inescapable lessons of history that the noted historian Santayana admonishes us to respect, or reap the harvest that follows. Most of us are willing to accept losing in court *if* we believe the contest has been fairly run, but it is to the proverbial streets if we believe we have not been given a fair shake.

As Judge Leavy observes, this case does indeed involve an unfortunate series of incidents. There is little doubt that Mr. Sandlin overreacted to his discovery of a change in the transcript of the hearing. Judge Leavy's analysis of Mr. Sandlin's breach of L.R. 1.2(f)(2) and WSRPC 8.2(a) is surely correct. Nevertheless, for reasons that I will now

explain, I believe the sanction imposed on Mr. Sandlin was manifestly excessive, and I would reverse the sanction imposed and remand for nothing more severe than a written reprimand.

With all respect, the genesis of this unfortunate incident was the imperfect handling by the district judge of his personal relationship with the witness Mr. Smith. According to an unchallenged statement by Mr. Sandlin in an FBI report [1], as Mr. Smith approached the witness stand, he and the district judge "smiled at each other, nodded their heads, and greeted each other verbally." This greeting as noted by Judge Leavy appeared to Mr. Sandlin to be of friends.

Based on these observations, Mr. Sandlin inquired of Mr. Smith on the subject of his relationship with the district judge. Here from the unedited record is how it went:

Q [By Mr. Sandlin] Mr. Smith, you're the Chief Executive Officer of the plaintiff, Crystal Linen, in this case?

A Yes.

Q Do you personally know Alan McDonald, the Judge in this case?

A Yes.

Q Have you socialized with him at the Country Club—

THE COURT: Counsel—just a minute. What is this all about?

MR. SANDLIN: Well, Your Honor, I need to know whether or not you have any personal relationship with Mr. Smith or any of the other parties—

THE COURT: You're not conducting discovery in this court as a basis for a motion for recusal; that's totally improper.

MR. SANDLIN: All right. Then for the record, your Honor, I would ask if in fact you do have a personal social relationship with Mr. Smith that you feel should be disclosed—that it be disclosed?

THE COURT: The court does not feel the least bit uncomfortable on (sic) sitting on this matter. The Court has known Mr. Smith and his brother. The Court has had the distinct honor of knowing their father

---

1. Sandlin's Exhibit 14, a seven-page FBI 302 Report of a statement made by Mr. Sandlin to

FBI Special Agent Oris E. Kirk, admitted in evidence without objection.

before them and would expect them to expect that this Court would rule impartially without any concern about that fact at all. Now, get on to the issues of the case.

MR. SANDLIN: Thank you Judge. Just for the record, Your Honor, we do request that you do consider recusal under these circumstances.

THE COURT: Well, this isn't the appropriate way or time to do that, Counsel.

MR. SANDLIN: All right. Thank you, Judge.

Q [By Mr. Sandlin] Mr. Smith—

THE COURT: Didn't you remove this case to this court?

MR. SANDLIN: Yes, I did Judge.

THE COURT: All right.

MR. SANDLIN: I was not aware of any social relationship you might have.

In my respectful judgment, the district judge made the following mistakes.

First, by his greeting and acknowledgment of Mr. Smith, the district judge demonstrated a relationship with a witness which one could rationally conclude was both personal and favorable. Any lawyer in Mr. Sandlin's position would have reason to be concerned, and reason to inquire. A judge must not display partiality to *any* witness. I'm certain it was not the judge's intention to do so, but nonetheless it attracted Mr. Sandlin's attention.

Second, instead of realizing the impact of the appearance he had just created, the district judge reacted somewhat sharply and blocked Mr. Sandlin from trying to find out if there was a problem that went beyond appearances. Moreover, instead of dousing the flames of Mr. Sandlin's concern, the district judge inappropriately brought Mr. Smith's father into the picture and suggested it was a distinct honor to have known him. This can only be seen as playing to the witness, because Mr. Smith's father—and whether it was an honor to have known him—had nothing whatsoever to do with the case. Such a statement clearly raises the specter of favoritism. Moreover, *what Mr. Smith and his family might know they could expect from the judge cannot be imputed to Mr. Sandlin*

*and his client.* In these circumstances, a judge would be well advised to notify the opposing party of his personal relationship with the party's opponent before it becomes an issue.

Third, the district court told Mr. Sandlin it was "totally improper" for him to explore this relationship. I disagree. In view of the manner in which the judge and the witness had just greeted each other, Mr. Sandlin had every right on behalf of his client to air this out. He would have been derelict not to pursue it. The judge himself should have taken the initiative to clear the air.

Fourth, the district judge was wrong when he told Mr. Sandlin his inquiry was not timely. Ordinarily this assessment would have been true, but it was not until Mr. Smith was greeted by the district judge that Mr. Sandlin had grounds for concern. Should Mr. Sandlin have waited until the hearing was over? What other viable option did he have? The issue of the temporary restraining order was in the balance. The issue of recusal had just arisen. 28 U.S.C. sections 144 (which uses the word "whenever") and 455 must be construed to permit a litigant the opportunity to explore a judge's partiality when the issue unexpectedly arises. I note that at all times Mr. Sandlin was polite and non-argumentative. He accepted the judge's admonition to drop the subject and went on with the hearing.

After the hearing, however, and at the behest of his client who believed the judge's behavior had been partial towards the Smiths, Mr. Sandlin discovered that the district judge while in private practice had represented Mr. Smith's brother and current co-owner of the plaintiff laundry in a wrongful death action. Having been shunted aside in court when he brought up recusal and told by the district judge that his method and timing were inappropriate, Mr. Sandlin then filed a formal motion for recusal. I can find nothing so far that merits criticism or censure of Mr. Sandlin. Yes, he may have misheard or misinterpreted the district judge's comments, but what the district judge did say was entirely consistent with Mr. Sandlin's apprehension that the district judge was favorably

disposed to the Smith family, including their father.

Then another mistake came to light which aggravated everything: the district judge had ordered a change in the transcript of the hearing, called "do-overs" by the reporter. Apparently this was a routine practice in his court. This is a procedure, however, for which there is no lawful justification even though the changes may have been "editorial" and not substantively significant. 28 U.S.C. § 753(b) contemplates that the official transcript shall be nothing short of verbatim.

Mr. Sandlin then went *not* to the newspapers or the public soapbox, but to the authorities responsible for alleged official misconduct: the U.S. Attorney, the FBI, and the Public Integrity Section of the Criminal Division of the Department of Justice. He is certainly correct when he cites the First Amendment for the proposition that he has a right to petition the Government for a redress of grievances. Although he may have far exceeded his proof and misstated his case, he cannot be faulted for reporting alterations in an official transcript to the proper authorities. Moreover, Mr. Sandlin did nothing publicly to denigrate the honor of the court or the district judge. The parties to whom he did go are bound by the law to keep their inquiry private. Indeed, none of this became public information until Judge McDonald lodged his complaint against Mr. Sandlin.

Thus, the district court was not entirely without responsibility for this situation. Had the court been more sensitive to its own conduct, this situation most probably would not have lurched out of control. Because the sanction of suspension is so draconian, I believe under these circumstances it is manifestly out of proportion to the offense.

Surely none of us enjoys being investigated by the FBI and the Public Integrity Section. But, when we have contributed to our own problem, we must see ourselves not as we would like to see ourselves, but as others might see us, especially when we create an appearance of partiality that is menacing to the people whose legal fates we control.

I sympathize with the district judge. There is no doubt he ruled in the hearing as he said he would, impartially and as he saw the law and the facts. Moreover, there is no substantial evidence in the record that he ordered deleted from the transcript a statement to the effect that Smith would be a truthful witness. No one likes to have his integrity questioned as no doubt the district court judge believed Mr. Sandlin was doing when he began his inquiry of Mr. Smith. Mr. Sandlin, whose mistakes have been well exposed by Judge Leavy, has written a formal letter of apology to the district judge. In retrospect, I believe the district judge will recognize the unintended appearance he created. Under the circumstances, I would also hope that the severity of the sanction imposed by Judges Quackenbush and McNichols would be reconsidered and that it would be reduced to a written reprimand.