NOT FOR PUBLICATION

### UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP Nos.  NC-11-1068-HDoD |
| | ) | NC-11-1069-HDoD |
| AVON TOWNHOMES VENTURE, | ) | |
| | ) | Bk. No.  11-41750 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| JOE GUERRA; RAYMUNDO LUJANO, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| NANNETTE DUMAS, U.S. Trustee; | ) | |
| ROBERT JARAMILLO; MOHAMED | ) | |
| POONJA, Chapter 7 Trustee, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on January 20, 2012
at San Francisco, California

Filed - March 29, 2012

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Roger L. Efremsky, Bankruptcy Judge, Presiding

Appearances:     Appellant Joe Guerra argued pro se.  Appellant
                 Raymundo Lujano argued pro se.  Scott Tate of
                 Schnader Harrison Segal & Lewis LLP argued for
                 appellee, Mohamed Poonja, Chapter 7 Trustee.

Before: HOLLOWELL, DONOVAN[2] and DUNN, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2] Hon. Thomas B. Donovan, United States Bankruptcy Judge for the Central District of California, sitting by designation.

Joe Guerra (Guerra) and Raymundo Lujano (Lujano) (collectively, the Appellants) each appeal the order of the bankruptcy court that imposed over $200,000 in sanctions against them, jointly and severally, for concealing an insider connection between the debtor and the purchaser of the debtor's main asset.[3] We AFFIRM.

## I. FACTUAL BACKGROUND

In 2001, Luis Aguilar (Aguilar) purchased real property in Lathrop, California (the Property) with two single family residences, which he rented out for income. Aguilar's ultimate goal was to construct townhomes on the Property. He sought a partner to assist him in developing the Property. Aguilar placed an advertisement for a developer and met Guerra as a result. He later entered into an agreement with Guerra to move the project forward. To that end, Aguilar and Guerra formed Avon Townhomes Venture (Avon).

Aguilar agreed to transfer the Property to Avon and to continue to make mortgage payments; Guerra agreed to take sole management control of Avon and was tasked with obtaining financing for the project, preparing construction plans, and obtaining building permits and approvals. Aguilar and Guerra

---

[3] The bankruptcy court imposed sanctions on other individuals along with the Appellants. Indeed, there was an entire cast of characters, including the officers and agents of the company Metricz, as well as the attorneys for Metricz and the debtor, which was subject to the bankruptcy court's order to show cause on whether sanctions were appropriate and its ultimate order imposing sanctions for misconduct. However, this memorandum decision is limited to the Appellants' conduct and responses.

were the sole shareholders of Avon, but Aguilar's interest in Avon was subordinated to the stock held by Guerra.

When Guerra made little progress in developing the Property, the relationship between Aguilar and Guerra soured. Aguilar had the rents from the residences paid to him directly and Guerra responded by "terminating" Aguilar's interest in Avon. Aguilar sued Guerra in October 2004, alleging damages for breach of contract and fraud.

On May 26, 2005, Guerra filed a chapter 11[4] bankruptcy petition for Avon.[5] Postpetition, Avon continued to act as the debtor-in-possession with Guerra serving as Avon's responsible individual. On November 10, 2005, Avon filed a motion seeking authority to sell the Property, as is, free and clear of ownership interests, to an entity known as Metricz, Inc. (Metricz) for $400,000 (Sale Motion).[6]

Lujano is Metricz's Chief Financial Officer and sole shareholder. Robert Jaramillo (Jaramillo) is Metricz's President. Jaramillo executed the proposed purchase contract for the Property on behalf of Metricz.

In its Sale Motion, Avon stated that it and its equity

---

[4] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[5] Guerra initially filed the petition pro se on behalf of Avon, but subsequently retained Stanley Zlotoff as Avon's counsel.

[6] Avon did not seek court approval to hire a real estate broker to market the Property.

owners were unrelated to Metricz. Additionally, Guerra stated in his declaration in support of the Sale Motion that neither he, Aguilar, nor Avon had any relationship or connection with Metricz.

Aguilar filed a limited objection to the Sale Motion. He consented to the sale, but proposed a competing bid by Thomas Sayles (Sayles). On December 7, 2005, the bankruptcy court conducted an auction for the Property, at which Metricz and Sayles participated (the Sale Hearing).[7] Jaramillo made the bids on behalf of Metricz. Metricz was the highest bidder at $610,000. At the Sale Hearing, Sayles and the United States Trustee (UST) expressed concerns that Guerra had some connection with Metricz. The bankruptcy court addressed the issue:

> If there are any connections between anybody, then that becomes a concern. . . . From my perspective the absolutely most important thing is that a sale is done fairly; it's legitimate; everybody has a fair shot at buying; that there's no shenanigans; there's no inside deals; there's no undisclosed relationships; there's none of this stuff. . . . There's an integrity of the process that to me is the most important. And I'd rather lose a sale than have one – one tainted by some wrongdoings.

Hr'g Tr. (Dec. 5, 2005) at 27:20-28:17.

The bankruptcy court offered to continue the Sale Hearing; however, after a recess, the parties decided to go forward with the auction. During the recess, Guerra represented to the UST that there was no connection between Avon or Guerra and Metricz or Metricz's officers or agents, and that Metricz had been

---

[7] Judge Grube presided over the Sale Hearing. The case was transferred to Judge Efremsky on July 31, 2006.

-4-

located through a real estate broker named Jim McClenehan (McClenehan) of a firm called Eagle Home Loan. The UST put that representation on the record.

The bankruptcy court then approved the sale. However, as a condition of the sale, it required Metricz to make two non-refundable deposits, $25,000 and $100,000, respectively, to Avon's attorney to be held in his trust account in advance of the close of escrow, or risk forfeiting its funds and losing the Property to Sayles for a back-up bid of $550,000. The final order authorizing the sale free and clear of interests and approving the sale to Metricz was entered on December 30, 2005. The sale closed on February 3, 2006.

In June 2006, Metricz filed an adversary proceeding against Avon, claiming Avon had represented that the Property had been granted valuable sewer rights from the City of Lathrop (Adversary Proceeding). It turned out that prior to the sale, Aguilar had the sewer rights terminated without Guerra's knowledge.[8] Metricz alleged that without the sewer hook-ups it was deprived of the opportunity to sell the Property for over $1 million. Avon sought a compromise of the Adversary Proceeding, which included

---

[8] Avon initially purchased the sewer hook-up rights with partial funds from a loan it obtained from a loan broker, Fernando Jimenez (Jimenez). The loan was secured by a second deed of trust on the Property. When the loan became due in April 2004, and was not paid by Avon, Aguilar obtained a personal loan from his parents to pay off the loan. The City of Lathrop refunded the $50,500 fee to Jimenez at Aguilar's request and Jimenez paid that sum over to Aguilar. Aguilar and Jimenez were defendants in the Adversary Proceeding.

paying the City of Lathrop $50,500 for reinstatement of the sewer hook-up rights.

The UST objected to the compromise because she was concerned there was an undisclosed relationship between Avon or Guerra and Metricz and possible collusion or misconduct related to the sale of the Property. Her concern was based on her discovery that incorporation documents showed that Metricz and Avon shared the same street address in San Jose, California, and the attorney representing Metricz, Samuel Goldstein (Goldstein), had represented Guerra on prior (unrelated) matters. Additionally, the UST was concerned that under the compromise, the estate would be required to pay for the sewer rights even though the Property had been sold "as is."

Thereafter, the UST sought conversion of Avon's case to chapter 7. Rather than converting the case, on May 11, 2007, the bankruptcy court appointed a trustee, Mohamed Poonja (the Trustee), to investigate the facts surrounding Metricz's purchase of the Property.

As part of his investigation, the Trustee conducted Rule 2004 examinations of Guerra and Lujano, as well as Jaramillo and McClenehan. At those examinations, Guerra testified that he had no communication or contact with anyone connected to Metricz prior to the Sale Hearing.

On January 24, 2008, the Trustee filed a report summarizing his investigation (Investigation Report). The Investigation Report concluded that Guerra had concealed a relationship with Metricz that preceded the sale of the Property. The Trustee

found that Guerra had, in fact, played a role in Metricz's formation and directed the sale transaction to Metricz.

In March 2008, the Trustee discovered that funds drawn on Guerra's son's bank account might have been used to pay the non-refundable deposits for the purchase price of the Property. The Trustee conducted additional Rule 2004 examinations to determine if Guerra or Metricz was concealing Guerra's involvement in the purchase of the Property.

On April 8, 2008, the Trustee filed a motion requesting that the bankruptcy court issue show cause orders based on his investigation, which "uncovered irrefutable evidence" confirming that Guerra committed a fraud on the bankruptcy court when he denied in his declaration supporting the Sale Motion, as well as his statements at the Sale hearing, that he did not have any connection to Metricz (the OSC Motion). The Trustee asserted that the Appellants were aware of the relationship between Guerra and Metricz but conspired to give false testimony at their Rule 2004 examinations to conceal Guerra's insider purchase of the Property. The Trustee requested the Appellants "show cause why the [bankruptcy court] should not impose sanctions jointly and severally against them in amounts sufficient to make the estate whole for the costs of uncovering their fraudulent scheme."[9]

---

[9] The Trustee requested the bankruptcy court order Goldstein to show cause why sanctions were not appropriate for his conduct in concealing the relationship between Metricz and Guerra, and for possibly advising or participating in a scheme to manufacture claims in the Adversary Proceeding.

On May 15, 2008, the bankruptcy court issued an Order to Show Cause (OSC). It ordered Guerra, Metricz, and Metricz's officers and agents, Lujano, Jaramillo, and McClenehan, to appear and show cause why they should not be sanctioned for misconduct. The OSC attached the OSC Motion and Investigation Report and required the parties to file memoranda, declarations and documentation addressing the Trustee's allegations "that they committed fraud upon the Court by actively concealing and misrepresenting an insider connection between Metricz as the purchaser of the [Property] and Avon and Guerra as Avon's responsible individual."[10] Finally, the bankruptcy court specified that if sanctions were warranted, they would be imposed under the bankruptcy court's § 105 inherent sanction authority.

On July 11, 2008, Guerra filed a declaration in response to the OSC stating that he had been unable to obtain legal counsel and that he denied each and every accusation made by the Trustee in his Investigation Report.[11] Lujano did not file a response to the OSC.

---

[10] The OSC was later amended to include Stanley Zlotoff, counsel for Avon, as well as Guerra in his capacity as Avon's President.

Additionally, the bankruptcy court issued a separate order to show cause in the Adversary Proceeding, requiring Metricz, Jaramillo, Lujano, McClenehan and Metricz's counsel, Goldstein, to show cause why the imposition of sanctions was not warranted in light of the Trustee's allegation that they manufactured the claims and damages asserted in the Adversary Proceeding.

[11] We have taken judicial notice of the bankruptcy court docket and various documents filed through the electronic docketing system. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1988); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

The bankruptcy court subsequently held nine days of evidentiary hearings on the OSC between July 25, 2008, and December 15, 2008 (the OSC Proceeding).[12]  The bankruptcy court invited the parties to file post-hearing briefs, but neither of the Appellants did so.  The bankruptcy court issued a memorandum decision (Memorandum Decision) on August 2, 2010, finding that the imposition of sanctions against the Appellants was appropriate because they lied under oath and committed a fraud on the court.  It found that "the parties held firm" throughout the Trustee's investigation

> in perpetuating the fiction that Metricz had purchased the Property and that [Guerra] had no connection with the sale or with Metricz.  This led directly to the [Trustee's] and his counsel's expenditure of hours upon hours of time and expense, in an attempt to figure out what really happened.

Memorandum Decision at 2.  Consequently, the bankruptcy court determined that, pursuant to its inherent authority to sanction bad faith conduct, sanctions were warranted in an amount necessary to compensate the estate for the expenses incurred in conducting the investigation, in uncovering the Appellants' bad faith conduct, and in participating in the OSC Proceeding.  The bankruptcy court, therefore, directed the Trustee to file a fee application setting forth those fees and costs.

The bankruptcy court also entered, pursuant to its Memorandum Decision, an order holding the Appellants jointly and severally liable for the fees and costs awarded to the Trustee

---

[12] The OSC Proceeding also encompassed the issues raised by the order to show cause entered in the Adversary Proceeding.

and his counsel for the investigation into their conduct, the exact amount of which the bankruptcy court would determine following a hearing on the Trustee's fee application.

Thereafter, the Trustee filed his third fee application (Fee Application). The Fee Application requested $64,794.50 in fees and $6,794.06 in costs, which represented the expenses incurred between September 1, 2008 through July 31, 2010, in conjunction with the investigation and OSC Proceeding. Furthermore, it set out the amount of fees and costs previously approved by the bankruptcy court that were attributable to the investigation into the Appellants' conduct with respect to the sale of the Property, which amounted to $190,202.00 in fees and $21,726.30 in costs.

The Fee Application was noticed to all parties and stated that a hearing would be held and the parties could file "any objection to the necessity and/or reasonableness of the fees and costs incurred . . . from the inception of the investigation and OSC Proceeding, regardless of whether such fees and costs were previously allowed and paid." The Appellants did not file an objection to the Fee Application or appear at the hearing on the Fee Application. The bankruptcy court approved the Fee Application on October 18, 2010.

On January 19, 2011, the bankruptcy court entered an order imposing $208,678.30 in sanctions against the Appellants, jointly and severally (the Sanctions Order). The Appellants' appealed.[13]

_____

[13] The Appellants filed premature notices of appeal on November 1, 2010, following the announcement of the bankruptcy court's ruling in its Memorandum Decision and its companion order
(continued...)

-10-

In their Reply brief on appeal, the Appellants raise the argument that the entire OSC Proceeding was tainted by an alleged ex parte communication between the Trustee and the bankruptcy court.

## II.   ISSUES

Did the bankruptcy court abuse its discretion in entering the Sanctions Order?

Did the bankruptcy court fail to provide the Appellants due process protections?

Was there an ex parte communication between the Trustee and the bankruptcy court that tainted the OSC Proceeding?

## III.   JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(A), (N) and (O).  We have jurisdiction under 28 U.S.C. § 158.

## IV.   STANDARDS OF REVIEW

We review all aspects of an award of sanctions for an abuse of discretion. Chambers v. NASCO, Inc., 501 U.S. 32, 55 (1991); F.J. Hanshaw Enter., Inc. v. Emerald River Dev., Inc., 244 F.3d 1128, 1135 (9th Cir. 2001); Price v. Lehtinen (In re Lehtinen), 332 B.R. 405, 411 (9th Cir. BAP 2005), aff'd 564 F.3d 1052 (9th Cir. 2009).  The bankruptcy court's choice of sanction is also reviewed for abuse of discretion. U.S. Dist. Ct. for E.D. Wash. v. Sandlin, 12 F.3d 861, 865 (9th Cir. 1993).

[13](...continued) that approved the Fee Application setting the amount of sanctions, but before the Sanctions Order was entered. Nevertheless, the notices of appeal are considered timely under Rule 8002(a).

-11-

A bankruptcy court abuses its discretion if it bases a decision on an incorrect legal rule, or if its application of the law was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. United States v. Hinkson, 585 F.3d 1247, 1261–63 (9th Cir. 2009) (en banc); Ellsworth v. Lifescape Med. Assocs. (In re Ellsworth), 455 B.R. 904, 914 (9th Cir. BAP 2011).

With respect to sanctions, a bankruptcy court's factual findings are reviewed for clear error and given great deference. F.J. Hanshaw, 244 F.3d at 1135. A factual finding is clearly erroneous if it is "illogical, implausible, or without support in the record." Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). Moreover, when factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985); see also Rule 8013.

Whether the Appellants' due process rights were violated is a question of law that we review de novo. Miller v. Cardinale (In re DeVille), 280 B.R. 483, 492 (9th Cir. BAP 2002), aff'd, 361 F.3d 539 (9th Cir. 2004).

///

///

///

///

-12-

## V.  DISCUSSION

**A.  The Bankruptcy Court's Finding Of Bad Faith Conduct Was Supported By The Evidence.**

Bankruptcy courts have the inherent power to sanction parties and their counsel for a broad range of misconduct, including "willfully abus[ing] judicial processes" or committing fraud on the court.[14]  Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980); Chambers, 501 U.S. at 45-46 (If a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess sanctions against the responsible party.).  However, under its inherent authority, a bankruptcy court may only impose sanctions for bad faith conduct or conduct tantamount to bad faith.  Fink, 239 F.3d at 994. Sanctions are available "for a variety of types of willful

_____

[14] Implicit in § 105(a) is the recognition that, like other federal courts, the bankruptcy court has the inherent authority to sanction a party for bad faith conduct that is not adequately sanctionable under the Rules or any other provision of law:

> No provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a); Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 284 (9th Cir. 1996).

A bankruptcy court's statutory civil contempt authority, also contained in § 105(a), is not the same as its inherent sanctions authority.  In re Lehtinen, 564 F.3d at 1058; Knupfer v. Lindblade (In re Dyer), 322 F.3d 1179, 1196 (9th Cir. 2003). The civil contempt authority allows a court to remedy a violation of a specific order, while the inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of misconduct.  Fink v. Gomez, 239 F.3d 989, 992-93 (9th Cir. 2001).

-13-

actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." Id. Therefore, even if a party does not act in bad faith but only recklessly, when the reckless conduct is coupled with an improper purpose, such as an attempt to influence or manipulate proceedings to gain an advantage, it is sanctionable under a court's inherent power. Id.

The Appellants argue that there was "no evidence whatsoever" that Guerra directed his son to provide the non-refundable deposits for the purchase of the Property. However, the bankruptcy court's finding that the deposits were made by Guerra's son was only one of its many findings that led to its conclusion that Guerra concealed a relationship with Metricz and that the Appellants acted in bad faith with respect to the sale of the Property.

A review of the record demonstrates that the bankruptcy court had sufficient evidence to support its finding that the Appellants acted in bad faith.[15] The bulk of the evidence relied

---

[15] The Appellants argue that the standard for establishing bad faith is by clear and convincing evidence. That is true in a civil contempt proceeding where "the moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." In re Dyer, 322 F.3d at 1191, quoting Renwick v. Bennett (In re Bennett), 298 F.3d 1059, 1069 (9th Cir. 2002). However, the clear and convincing evidence standard has not been identified by the Ninth Circuit as being the applicable burden of proof for establishing bad faith before a court may impose sanctions under its inherent authority. Id. at 1196; In re Lehtinen, 564 F.3d at 1061 n.4. Because the record demonstrates that the bankruptcy court had sufficient evidence to support its finding of bad faith (continued...)

-14-

on by the bankruptcy court was witness testimony.[16] Although it found that there were "conflicting and ever-changing stories," the bankruptcy court concluded that Guerra acted in bad faith because he concealed that he "was intimately involved with Metricz and that he orchestrated the sale to, and purchase by, Metricz." Memorandum Decision at 47.

The testimonial evidence submitted at the OSC Proceeding revealed that Guerra chose McClenehan, with whom he (and his family members) had done business for over 20 years, to market the Property on behalf of Avon. However, Guerra did not seek approval to employ McClenehan as Avon's real estate broker, did not provide McClenehan details of the Property or its value, did not follow up with McClenehan, or ensure that the Property was listed or being marketed appropriately. The evidence indicated that Lujano was fortuitously introduced to McClenehan soon after Guerra sought McClenehan's assistance.

Hernandez, who incorporated Metricz, had a role in facilitating Lujano's purchase of Metricz and introducing Lujano

---

[15](...continued)
under either a clear and convincing standard or a lesser standard, we need not decide here which standard applies.

[16] In many instances, the Appellants did not provide testimony but asserted their Fifth Amendment right against self-incrimination. The Appellants' assertion of their Fifth Amendment rights, however, does not prevent the bankruptcy court from drawing adverse inferences from that assertion. Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (court may make adverse inferences against parties in civil actions who refuse to testify in response to probative evidence offered against them).

to McClellan.[17]  Hernandez and Guerra were long-time friends. Moreover, Guerra knew Jaramillo, Metricz's President.  Jaramillo worked for an attorney named Tom Salciccia (Salciccia). Salciccia had represented Guerra in prior matters and was the corporate service agent for both Metricz and Avon.  In fact, Metricz's mail was delivered to Salciccia's office and left by Jaramillo for Guerra to pick up.

The connections between Guerra and Metricz do not end there. The non-refundable deposit money for the Property was paid by Guerra's son, Curtis.  Curtis delivered a $25,000 check to McClenehan made payable to McClenehan's business.  McClenehan then issued a check in the same amount to Guerra, who in turn purchased a cashiers' check for delivery to Avon's attorney.  A similar scenario took place with respect to the second non-refundable deposit.  Although Guerra contended that Curtis was investing in McClenehan's business, McClenehan denied that contention.

Thus, the evidence clearly demonstrated that Guerra had a prior relationship to Metricz and its officers and agents, which he concealed.

The bankruptcy court found that Lujano acted in bad faith because he refused to admit that he was a "willing pawn in Mr. Guerra's scheme to purchase the Property from the estate," that "[h]is fabrications wasted judicial time and resources,

---

[17] Lujano could not remember if it was Hernandez or someone named Carlos de la Torre (Torre) who advised him on Metricz.  He testified that he did not know anything about corporations and relied on the advice of others who told him having a corporation would facilitate buying the Property.

-16-

forced the Trustee to conduct extensive investigation and incur significant expense, and violated the integrity of the bankruptcy system as a whole." Memorandum Decision at 66. The bankruptcy court's finding was based on testimonial evidence that demonstrated Lujano was not actively involved in selecting the Property and knew little about it. Lujano admitted he relied on Jaramillo or McClenehan to help him make decisions regarding Metricz, to facilitate all paperwork and to collect the rents from the Property. Lujano also testified that McClenehan managed the payments that Lujano personally owed on two mortgage loans that he had obtained in order to purchase the Property for Metricz. On the financing applications for those loans Lujano listed bank accounts belonging to Guerra's son, Joe, as among his financial resources.

Lujano was unable to produce documentation concerning Metricz's payment of the non-refundable deposits for the Property. Lujano contended that he had personally raised $150,000 from his church and gave the money to McClenehan. However, Lujano could not provide any documentation that the money had been raised, had been deposited into a bank account, or had been delivered to McClenehan. Moreover, McClenehan testified that he did not receive any cash (or money whatsoever) from Lujano or anyone else on behalf of Metricz. Finally, Goldstein admitted that he delivered documents intended for Lujano or Jaramillo to Guerra and that Guerra returned such documents to Goldstein.

In short, there was ample evidence to support the bankruptcy court's finding that the Appellants had made misrepresentations

to the bankruptcy court when they repeatedly denied a relationship between Guerra and Metricz and its principals, as well as subsequently concealed the relationship during the pendency of the bankruptcy case, the initiation of the Adversary Proceeding, and the Trustee's investigation. As a result, the bankruptcy court's finding that the Appellants' conduct was tantamount to bad faith and "wasted judicial time and resources and defiled the integrity of the bankruptcy system" was not clearly erroneous.

**B.    The Appellants Were Afforded Due Process Protections.**

The Appellants argue that their due process rights were violated because the bankruptcy court (1) imposed criminal sanctions; (2) violated Lujano's Fifth Amendment rights; and (3) failed to assess the Appellants' culpable conduct, ability to pay sanctions, or whether their wrongdoing prejudiced anyone. We address these concerns in turn.

In order to protect against abuse and to ensure parties receive due process, individuals subject to sanctions are afforded procedural protections. F.J. Hanshaw, 244 F.3d at 1137. When an individual is subject to sanctions, he or she has a right to receive notice of the particular alleged misconduct and of the disciplinary authority under which the court is planning to proceed, along with an opportunity to respond. In re Ruffalo, 390 U.S. 544, 551–52 (1968); In re Lehtinen, 564 F.3d at 1060. "[W]hen using the inherent sanction power, due process is accorded as long as the sanctionee is 'provided with sufficient, advance notice of exactly which conduct was alleged to be sanctionable, and [was] furthermore aware that [he] stood accused

-18-

of having acted in bad faith.'"  Id. (citing In re DeVille, 361 F.3d at 548).

Here, the OSC notified the Appellants that the bankruptcy court was considering imposing sanctions pursuant to its inherent authority.  The OSC apprised the Appellants of the specific conduct at issue (concealing and misrepresenting an insider connection between Guerra and Metricz in the purchase of the Property), and also alerted the Appellants to the compensatory nature of the proposed sanctions by its reference to the OSC Motion.

Additionally, the Appellants were provided the opportunity to respond to the OSC.  The bankruptcy court held no less than nine days of evidentiary hearings to solicit evidence and testimony from all parties concerned in order to understand the facts surrounding the sale of the Property.  Guerra attended and participated in the OSC Proceeding.  Lujano also attended part of the OSC Proceeding and provided testimony.  Additionally, the bankruptcy court afforded the Appellants the opportunity to present post-hearing briefs and to object to the fees and costs submitted by the Trustee (even those that had previously been approved), on which the sanction award was based.

On the first day of the OSC Proceeding, the bankruptcy court made clear to the parties that the scope and nature of the potential sanctions could be comprised of reimbursement to the estate for the fees and costs associated with the Trustee's investigation.  The bankruptcy court notified the parties that the expenses were at least $150,000 given the amount of fees and costs already approved.  The bankruptcy court stated that even

-19-

though the amount of money at issue was significant, the sanctions were civil, not criminal, and that the OSC Proceeding was purely a civil proceeding to determine whether bad faith conduct existed to justify sanctions. See Hr'g Tr. (July 25, 2008) at 10-23.

As a result, the Appellants's assertion that their due process rights were violated because they did not "know from reading the OSC the extent of the sanctions that could be awarded in order to decide whether to default or vigorously contest the allegations" is meritless. See Reply at 7. The bankruptcy court provided the Appellants proper due process protections before it imposed sanctions.

### 1. Civil Sanctions

Because of "their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S at 44. However, "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction" for bad faith conduct. Id. at 44-45. Nevertheless, a court's inherent sanction authority "does not authorize significant punitive damages." In re Lehtinen, 564 F.3d at 1059 (quoting In re Dyer, 322 F.3d at 1197). Bankruptcy courts cannot authorize significant punitive damages because they cannot provide full due process protections, such as a jury trial. F.J. Hanshaw, 244 F.3d at 1139.

The Appellants contend that the bankruptcy court imposed criminal sanctions because the sanction award "did not compensate anyone" but rather "punished the [A]ppellants in an effort to vindicate the trial Court's process." Appellants' Opening Br.

at 5. However, the sanction amount was commensurate with the expense to the estate of investigating and uncovering the Appellants' bad faith conduct. Such compensatory sanctions are within the court's inherent authority. In re DeVille, 361 F.3d at 546. Furthermore, compensatory sanctions are not considered criminal penalties: "Civil penalties must either be compensatory or designed to coerce compliance." F.J. Hanshaw, 244 F.3d at 1137-38; Lasar v. Ford Motor Co., 399 F.3d 1103, 1110 (9th Cir. 2005) (sanctions that compensate for any harm caused are civil); see also In re Dyer, 322 F.3d at 1197.

The bankruptcy court's choice of sanction is within its sound discretion. Sandlin, 12 F.3d at 865. Here, the bankruptcy court imposed compensatory sanctions because it found that the continued concealment by the Appellants of the connection between Guerra and Metricz harmed the bankruptcy estate "by virtue of the fact that the Trustee and his counsel were required to spend large amounts of time and money in attempting to figure out exactly what happened. This is money that could have and should have gone to creditors." Memorandum Decision at 36. We perceive no abuse of discretion in the bankruptcy court's decision to issue sanctions in an amount commensurate with the loss of money to the estate.

2. Fifth Amendment Rights

The Appellants contend that Lujano's Fifth Amendment rights were violated when the bankruptcy court required him to testify about Metricz's role in the purchase of the Property or risk a contempt fine. The Fifth Amendment protects individuals from being forced to incriminate themselves during a legal proceeding.

-21-

U.S. Const. amend. V.

In requiring Lujano's testimony, the bankruptcy court clarified that it was seeking testimony or other documentary evidence from Metricz that demonstrated its purchase of the Property was an arms-length transaction. Because the bankruptcy court requested the information from Lujano as the representative of the corporate entity, Metricz – not as an individual officer or director of Metricz – it determined that the Fifth Amendment right against self-incrimination was inapplicable. See Braswell v. United States, 487 U.S. 99, 105 (1988) (privilege against self incrimination protects only natural persons, not artificial entities such as corporations). A corporate custodian is denied Fifth Amendment protection for acts done in a representative capacity. "Because an artificial entity can only act through its agents, a custodian of such an entity's documents may not invoke [his] personal privilege to resist producing documents . . . even if the documents may also incriminate the custodian." Baltimore City Dept. of Soc. Servs. v. Bouknight, 493 U.S. 549, 567 (1990) (citing United States v. White, 322 U.S. 694, 699 (1944)).

To the extent Lujano's testimony was taken as an individual, not a custodian of Metricz, we note that the Fifth Amendment's protection against self-incrimination "may only be invoked when the threat of future criminal prosecution is reasonably particular and apparent." U.S. v. Antelope, 395 F.3d 1128, 1134 (9th Cir. 2005). "If the threat is remote, unlikely, or speculative, the privilege does not apply." Id. (internal citations omitted). Here, there was no likely threat of criminal prosecution. The bankruptcy court repeatedly reminded the

parties that the OSC Proceeding was purely civil in nature. There was no criminal proceeding pending (or threatened) against any of the parties, and neither the Trustee nor the UST ever indicated that the matter would be further investigated or prosecuted beyond the OSC Proceeding.

Furthermore, even if Lujano's testimony and statements were obtained in violation of his Fifth Amendment rights, the result would not mandate vacating the Sanctions Order, as argued by the Appellants.  Instead, Lujano would be entitled to a hearing prior to a subsequent criminal proceeding to demonstrate that any evidence the government intended to introduce was free from the taint of compelled statements and based on independent sources. United States v. Anderson, 79 F.3d 1522, 1526 (9th Cir. 1996); United States v. Koon, 34 F.3d 1416, 1431 (9th Cir. 1994), cert. granted in part on other grounds, 515 U.S. 1190 (1995).

### 3.    Assessment Of Various Other Factors

The Appellants argue that the bankruptcy court erred by failing to assess: (1) their culpable conduct; (2) whether there was a pattern of wrongdoing; (3) whether the Appellants could pay sanctions; or, (4) whether their wrongdoing prejudiced anyone. As a result, they assert they should have been accorded a hearing to assess these factors.[18]  This argument was not made in the

_____

[18] The Appellants rely on Republic of Philipines v. Westinghouse Elec. Corp., 43 F.3d 65 (3rd Cir. 1994) for their contention that the bankruptcy court was required to address certain factors before imposing sanctions.  There, the Third Circuit held that a court must "ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is
(continued...)

-23-

bankruptcy court.

We have discretion to review newly presented issues on appeal if (1) there are "exceptional circumstances" why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court. <u>Rhoades v. Henry</u>, 598 F.3d 495, 501 n.7 (9th Cir. 2010). The Appellants have not argued, and we do not determine, that any of the exceptions to the rule apply.

The bankruptcy court provided the Appellants with the opportunity to object to the Trustee's fees and costs before it entered the Sanctions Order. The Appellants did not file any post-hearing briefs. They did not contest or file any response to the Fee Application. Thus, it is unclear what exceptional circumstance would allow them to pursue those arguments now. Furthermore, there has been no intervening change in the law. Finally, allowing consideration of the Appellants' new arguments would prejudice the Trustee because their arguments are not legal questions subject to de novo review. Accordingly, we decline to

---

[18](...continued)
tailored to address the harm identified." <u>Id.</u> at 74. It ruled that courts should be guided by the same considerations as required by the Federal Rules of Civil Procedure when imposing sanctions under their inherent authority: a court issuing sanctions "must consider the conduct at issue and explain why the conduct warrants sanction" and "must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate." <u>Id.</u> at 74.

address the Appellants' argument that the bankruptcy court should have addressed various factors, such as the Appellants' ability to pay, or whether there was a pattern of wrongdoing, before deciding the amount of sanctions to impose.

**C.   The Alleged Ex Parte Communication Between The Trustee And The Bankruptcy Court Did Not Taint The Propriety Of The Sanctions Proceeding.**

The Appellants, in their Reply brief, assert that they have obtained new evidence that indicates the OSC Proceeding was unfair.  The Appellants allege that the Trustee's counsel engaged in an impermissible ex parte communication with the bankruptcy court.  In support of their allegation, the Appellants submitted a copy of what appears to be a draft summary of the Trustee's Investigation Report (Draft Report) and a copy of a delivery air bill receipt indicating that the Draft Report was mailed to chambers approximately one month before the final Investigation Report was filed.  The Appellants contend that we should stay the proceedings "while a trial court considers what to do . . . and consider whether the ex parte communication so tainted the proceedings below that the trial court's ruling should be vacated."  Reply at 20.

The Appellants have not taken any action in the bankruptcy court based on this new evidence.  As noted above, we generally do not consider issues raised for the first time on appeal.  However, since the Appellants have asserted that the Draft Report was newly obtained evidence, which negatively affected the OSC Proceedings, we exercise our discretion and address the issue.

Generally, ex parte communications between a trustee and the bankruptcy court that affect a particular case or proceeding are

-25-

prohibited by Rule 9003(b). The party seeking revocation of a bankruptcy order due to an ex parte communication must demonstrate that he was prejudiced by the communication or that the bankruptcy court judge was biased against him. Shop Television Network, Inc. v. Chodos (In re Shop Television Network, Inc.), 170 B.R. 413, 418 (C.D. Cal. 1994). The issue is whether the information that the judge received was information that could, or did, affect the bankruptcy court's ruling. See Metcalf v. Golden (In re Adbox, Inc.), 234 Fed. Appx. 420, 421 (9th Cir. 2007); United States v. Madrid, 842 F.2d 1090, 1094 (9th Cir. 1988); In re Allen, 2009 WL 856985 *9 (Bankr. D. Idaho 2009).

The Appellants have not demonstrated that the bankruptcy judge actually received or read the Draft Report, only that a copy was delivered to the bankruptcy judge's chambers. However, many judges' chambers have procedures for destroying or docketing ex parte communications prior to the bankruptcy court judge ever seeing the documents. More importantly, the Appellants have not articulated how the Draft Report could have prejudiced them in the OSC Proceeding. Indeed, they asserted merely that "the Judge may have been influenced" or that "bias could have been the effect" of the Draft Report. Reply at 16-17.

The Appellants cannot establish that the Draft Report amounted to an actual communication between the Trustee and the bankruptcy judge, or that the alleged communication resulted in prejudice or bias. Consequently, we conclude that the OSC Proceeding was not tainted or unfair.

## VI.  CONCLUSION

For reasons set forth above, we AFFIRM the bankruptcy court's Sanctions Order.